## In re PERMANENT SURFACE MINING REGULATION LITIGATION (Consolidated Action).

### Civ. A. No. 79–1144.

United States District Court, District of Columbia.

July 15, 1985.

---

1522

**1524**

Terence L. Thatcher, Jonathan Lash, L. Thomas Galloway, Warner W. Gardner, I. Michael Greenberger, Nancy J. Bregstein, Andrew H. Marks, Washington, D.C., Harvey M. Sheldon, Chicago, Ill., Michael J. Henke, Washington, D.C., Roger L. Chaffe, Richmond, Va., Roger H. Trangsrud, Steve Friedman, John A. Macleod, Richard McMillan, Jr., David R. Case, Thomas C. Means, Fred S. Souk, Norman L. Dean, Jr., Hope Babcock, Mark Squillace, Thomas H. Altmeyer, James T. Hemphill, Richard Flye, Christian Volz, Washington, D.C., for plaintiffs.

Alfred T. Ghiorzi, Milo Mason, Francis J. McShelley, Richard Flye, Craig W. Hulvey, Washington, D.C., Guy Neville, Houston, Tex., Thomas Fitzgerald, Lexington, Ky., for defendants.

Barbara H. Brandon, Alan S. Miller, Pittsburgh, Pa., for Commonwealth of Pennsylvania Dept. of Environmental Resources.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This opinion addresses issues in the Round III briefing of challenges to regulations promulgated by the Secretary of the Interior under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "the Act"), 30 U.S.C.A. § 1201 *et seq.* (West Supp.1985). The history of this litigation is set out in this court's Round I opinion filed July 6, 1984. *In Re: Permanent Surface Mining Regulation Litigation II*, No. 79–1144, slip op., Round I, (D.D.C. July 6, 1984) ("Round I Opinion"). The court decided Round II issues in an opinion filed in this action on October 1, 1984 ("Round II Opinion"). The court agreed to hear and decide in advance of other Round III issues, issues raised by the promulgation of a final rule defining the term "valid existing rights" ("VER") as used in § 522(e), 30 U.S.C. § 1272(e), of SMCRA. The VER issue was decided on March 22, 1985 ("VER Opinion"). Oral argument was heard by the court on the remaining Round III issues on April 4,

1985, and the matter was taken under advisement. Bearing in mind the standard of review set out in this court's Round I Opinion at pp. 2–3, the court now turns to the issues before it.

## I. Hydrology and Geology Permitting

### A. The Secretary's Rule on Water Supply Replacement

■ Industry has challenged 30 C.F.R. § 816.41(h) (1984), 48 Fed.Reg. 43991 (1983), which mirrors § 717, 30 U.S.C. § 1307 of SMCRA, and requires replacement of water supplies that have been adversely affected by surface mining operations, claiming that to the extent it would require mining operators with senior water rights to replace the water supplies of users with junior water rights, the regulation violates § 717(a) of the Act which declares that:

Nothing in this chapter shall be construed as affecting in any way the right of any person to enforce or protect, under applicable law, his interest in water resources affected by a surface coal mining operation.

In his response to Industry's motion the Secretary stated:

The Secretary agrees that § 717(a) requires deference to State water law on questions of water use, and thus interprets § 717(b) and the rule at issue as *not* requiring the replacement of water supplies to the extent a surface coal mine operator consumes or legitimately uses the water supply under a senior water right determined under applicable State law.

Sec.Res. at 6 (emphasis added). Industry then responds that "[w]ith the embodiment of this interpretation in the Court's opinion, the regulation no longer may be read to violate SMCRA and we withdraw our challenge to it." Indus. Reply at 11. In their response citizen intervenors challenge the Industry's interpretation of §§ 717(a) and (b) of the Act and argue that the statute cannot be read to allow mining operations the water rights to which they are entitled under state law. The thrust of their argument is that § 717(a) is a savings clause "aimed at preserving rights and remedies for interests injured by mining activities; it is not an exculpatory clause for avoiding statutorily imposed responsibilities under section 717(b)." Intervenors Citizen Plaintiffs' Mem. at 31. They further argue that there is no indication that Congress saw the water replacement provisions of § 717(b) as being subservient to state law. They suggest that this provision is here to retain for those possibly affected whatever rights they have outside SMCRA.

Citizen-intervenors have not convinced the court—at least with respect to senior water rights legitimately exercised—why the miners should not be able to benefit from a plain reading of § 717(a).

### B. Requiring Underground Mine Operators to Restore Premining Recharge Capacity

Industry plaintiffs next challenge 30 C.F.R. § 817.41(b)(2), 48 Fed.Reg. 43992 (1983), which states:

Ground-water quantity shall be protected by handling earth materials and runoff in a manner that will restore approximate premining recharge capacity of the reclaimed area as a whole, excluding coal mine waste disposal areas and fills, so as to allow the movement of water to the groundwater system.

This challenge is another in the dispute over the extent to which the Act requires underground mines to replace water supplies. The Secretary in his response noted that it was voluntarily suspending this rule: "[T]he Secretary will suspend 30 C.F.R. § 817.41(b)(2) pending a new rulemaking that will develop a more complete administrative record concerning the complex legal and policy issues associated with the requirement for underground miners to restore hydrologic recharge capacity." Sec.Res. at 5 n. 3. Given the Secretary's decision to perform a new rulemaking on this issue, the court concludes that this issue is not now properly before the court

and any challenge will be better framed upon completion of the new rulemaking.

### C. Lawful Promulgation of Hydrology Regulations

Industry plaintiffs challenge the requirement throughout the hydrology performance standard regulations that mining and reclamation activities "be conducted to minimize disturbance of the hydrologic balance within the permit and adjacent areas, [and] to prevent material damage to the hyrdologic balance outside the permit area." Indus. Motion at 19 (citing 30 C.F.R. §§ 816.-41(a), 817.41(a); 816.41(c)(3)(i), 817.-41(c)(3)(i); 816.41(e)(3)(i), 817.41(e)(3)(i); 816.41(i)(1)(i), 817.41(h)(1)(i); 816.43(a)(1), 817.43(a)(1)). Industry complains that "[t]o the extent that these regulations require operators to prevent material damage to the hydrologic balance outside the permit area, they were adopted in violation of the APA and SMCRA, and are inconsistent with SMCRA's substantive mandate." Industry Motion at 19.

### 1. *The Requirements of the APA*

■ Industry claims that the final rules as promulgated which require that material damage be prevented outside the permit area were promulgated without adequate notice and comment because nowhere in the proposed rules was such a requirement even hinted at. The Secretary responds by pointing to the fact that with regard to *two* of the proposed regulations, 30 C.F.R. §§ 816.41(a) and 817.41(a), the Secretary made clear that:

> The regulatory authority may require additional preventive, remedial, or monitoring measures to assure that material damage to the hydrologic balance is prevented.

47 Fed.Reg. 27730, 27732 (1982).

The court notes that this notice made clear that it was the Secretary's position that the regulatory authority would have the legal authority to require that steps be taken to prevent material damage to the hydrologic balance. The court also notes that the above language was used in the portion of the proposed regulations labeled "General." Thus, it is misleading to characterize the notice as applying to only two of twelve regulations. Finally, Industry's complaint is that the Secretary does not have the legal authority to require prevention of material damage outside the permit area; the only difference between the rule as proposed and the final rule is that rather than leave it up to the regulatory authorities, the Secretary took it upon himself to promulgate regulations relating to the prevention of material harm outside the permit area. The court finds that this rule grew logically out of the proposed rule, and that the parties were sufficiently on notice that the Secretary read the Act as supporting such prevention.

### 2. *Substantive Supportability of the Regulations*

■ Industry next complains that the requirement that mining and reclamation activities be conducted to prevent material damage to the hydrologic balance outside the permit area is also substantively inconsistent with SMCRA. It argues that the Act requires a *mine operator* to *minimize disturbances* to the hydrologic balance, whether inside or outside the permit area, but requires the *regulatory authority* to prevent *material damage* outside the permit area. Industry argues that to the extent that the Secretary relies on § 510(b)(3), 30 U.S.C. § 1260(b)(3), for the rule, that reliance is misplaced. That section sets forth the requirements for permit approval by the regulatory authority, and declares that no permit will be approved unless the regulatory authority finds that

> (3) the assessment of the probable cumulative impact of all anticipated mining in the area on the hydrologic balance ... has been made by the regulatory authority and the proposed operation thereof has been designed to prevent material damage to hydrologic balance outside permit area.

Industry claims that the plain import of this provision is that the regulatory authority makes a determination whether the indi-

vidual permit sought will, when added to the other approved mining operations, damage the hydrologic balance outside the permit area, and if it will, then it cannot grant the permit. Read this way, the provision leaves the issue of whether there will be damage outside the permit area to the regulatory authority, but leaves no enforcement mechanism short of denying a permit.

Industry also argues that because § 510(b)(3) does not establish a performance standard that it would be inconsistent with the Act to turn this provision into a substantive requirement to be carried out by the mine operators. Industry points out that sections 515(b)(10) and 516(b)(9), 30 U.S.C. §§ 1265(b)(10) and 1266(b)(9), establish the hydrology performance standards in the Act and that they merely require the operator to "minimize the disturbances [to] the prevailing hydrologic balance at the mine site and in associated offsite areas." They further claim that limiting any performance requirement to those found in these sections makes sense because the operator "would not necessarily have any knowledge of the effects of other mining operations in that area, much less control over them." Industry Mem. at 23.

The Secretary responds that it makes little practical sense to read § 510(b)(3) as merely applicable to the issuance of permits and not forming the basis for operators' actual performance. He argues that sections 515(b)(10) and 510(b)(3) are interdependent, and that in any event although the general requirements of § 515(b)(10) merely refer to minimizing harm, the specific requirements effectively require that no material damage be done. To support this proposition the Secretary cites § 515(b)(10)(A) avoiding acid mine drainage; § 515(b)(10)(D) restoring recharge capacity; § 515(b)(10)(E) avoiding channel deepening; § 515(b)(10)(F) preserving hydrologic functions of alluvial valley floors.

The Secretary reads § 510(b)(3) as requiring a finding by the regulatory authority that the specific operation is designed to prevent material damage outside the permit area, whereas industry reads the provi-

sion as requiring a finding that the sum total of all operations is designed to prevent material damage. The court is persuaded that the Secretary has the authority to be certain that the applicant has designed the operation in such a way as to prevent material damage outside the permit area. First, the words of § 510(b)(3) support such a view in that they require a finding that the "proposed operation thereof has been designed to prevent material damage to hydrologic balance outside permit area." The reference to the permit area suggests not that it is the sum total of all mining which has been designed to prevent material damage, because in that context the phrase "outside permit area" has no meaning. Rather, the provision makes sense only if read to require the regulatory authority to determine that the particular operation has been designed to prevent damage outside the permit area. This reading renders the word "thereof" surplusage, but reference to the permit area along with use of the word "operation" which is used within the rest of § 510 to refer to the particular operation seeking permit approval, *see* § 510(b)(5), (c), lead the court to conclude that the regulatory authority can only approve a permit if it is convinced that the permittee's operation is designed to prevent material damage outside the permit area.

Industry, however, necessarily takes the view that although this is what the regulatory authority must do, the section can impose no obligation on it because it is not embodied in a performance standard. Thus, although the Secretary cannot grant a permit unless he is convinced that the operation is designed to prevent material damage, he cannot prescribe regulations aimed at preventing such damage. The court will not read so narrowly the Secretary's rulemaking authority. This is not a controversy similar to that surrounding the relationship between § 508(a)(13), 30 U.S.C. § 1258(a)(13), and § 717(b), 30 U.S.C. § 1307(b), discussed *infra,* where citizen plaintiffs are arguing that the Secretary is required to read the statute in such a way that two provisions contradict one another,

and that the Act requires the promulgation of regulations under that contradictory reading. Here, the regulatory authority has been specifically granted authority to be certain that surface coal mining operations are designed in such a way as to prevent material damage outside the permit area, and the Secretary has promulgated rational regulations to that end. The Act grants the Secretary authority to promulgate "such rules and regulations as may be necessary to carry out the purposes and provisions of this chapter." § 201(c), 30 U.S.C. § 1211(c). The Industry objections are rejected.

### D. Information on Hydrologic Impacts for the Permit Period Alone

■ This court in its February 1980 opinion struck down the Secretary's definition of "mine plan area" which effectively required coal companies to "supply information for areas outside the permit boundary. It also require[d] information covering the entire life of the mining operation." *In Re: Permanent Surface Mining Regulation Litigation I,* No. 79–1144, slip op. at 35 (D.D.C. Feb. 26, 1980) [hereinafter cited as Feb. 1980 Opinion]. The basis of the court's decision was that while §§ 507(b)(11) and 508(a)(13) of the Act, 30 U.S.C. §§ 1257(b)(11), 1258(a)(13), require hydrologic information both on and off the mine site, and § 508(a)(1), 30 U.S.C. § 1258(a)(1), requires the identification of the lands to be mined over the life of the mining operation, the other subsections of §§ 507 and 508 do not require information beyond the "specific land mined or the immediate permit area. The court [drew] the conclusion that Congress articulated, with specificity, those instances in which information outside the permit area was necessary." Feb. 1980 Opinion, *supra,* at 35. The court found it arbitrary and capricious for the Secretary to take the three most expansive informational requests, embodied in §§ 507(b)(11), 508(a)(13) and 508(a)(1), and apply them to less extensive informational needs. Feb. 1980 Opinion, *supra,* at 35–36.

In its May 1980 Opinion, the court responded to the Secretary's request for a clarification and the court noted that some of the regulations that employed the term "mine plan area" may be acceptable because they derive authority from these broader statutory sections. *In Re: Permanent Surface Mining Regulation Litigation I,* No. 79–1144, slip op. at 57 (D.D.C. May 16, 1980) [hereinafter cited as May 1980 Opinion]. The court declined, however, to rule on the merits of this possibility, preferring to submit the question to further rulemaking. Thus, this court's opinion did not focus on any particular regulations using the phrase "mine plan area" as then defined.

Plaintiff citizen and environmental groups challenge the failure of the Secretary to include information on, and analysis of, the hydrologic impacts over the entire life of the mine in 30 C.F.R. § 780.21(f) (1984), 48 Fed.Reg. 43986 (1983), and § 784.14(e) (1984), 48 Fed.Reg. 43988 (1983). Plaintiffs contend that the rules being challenged wrongfully require that operators submit information only with respect to those activities conducted during the life of the permit rather than activities to be conducted during the life of the mine. Section 507(b)(11), 30 U.S.C. § 1257(b)(11), of the Act requires that the permit application contain:

a determination of the probable hydrologic consequences of the mining and reclamation operations, both on and off the mine site, with respect to the hydrologic regime, quantity and quality of water in surface and ground water systems including the dissolved and suspended solids under seasonal flow conditions and the collection of sufficient data for the mine site and surrounding areas so that an assessment can be made by the regulatory authority of the probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area and particularly upon water availability: *Provided, however,* That this determination shall not be required until such time as hydrologic information on the general area prior to mining is made available

from an appropriate Federal or State agency: *Provided further*, That the permit shall not be approved until such information is available and is incorporated into the application.

Plaintiffs make four arguments. Their first two arguments the court finds unpersuasive; they are based on this court's earlier opinion and the legislative history. This court's earlier opinion is outlined above and has ultimately little bearing on the subject of whether the operator is to submit information for activities beyond the life of the permit. The legislative history does not support the citizen plaintiffs' argument either. It at best demonstrates that Congress wanted life of the mine analysis being done, and that the reclamation plan must cover all the lands to be mined as indicated in § 508(a)(1), but it does not help the court decide whether the life of the mine analysis was to be done by the operator in the determination of probable hydrologic consequences ("PHC"), as opposed to the regulatory authority doing the life of the mine analysis in the cumulative hydrologic impact analysis ("CHIA").

The plaintiffs' final arguments address the reasonableness of the final rule. The thrust of their argument is that if the operators are not required in the PHC to evaluate the impact of activities over the life of the mine, then the regulatory authority will be unable to perform its CHIA because it will lack either the information or the resources necessary to gather the information. They contend that it is impractical and against public policy *not* to require hydrologic information over the life of the mine because the operator's submission under § 507(b)(11) in the PHC is the building block for the CHIA to be done by the regulatory authority. This, they argue, is so because under the final rules, the Secretary has made clear that the CHIA "required under sections 507(b)(11) and 510(b)(3) of the Act should cover the life of the mine and should include offsite areas." 48 Fed.Reg. 43965. Failure to require a life-of-the-mine determination from the operator, they argue, results in a gap in the hydrologic determinations required by the Act. Further, they contend that the permit applicant "is unquestionably in the best position both to collect the hydrologic data for his proposed site and to conduct the initial analysis of the impacts his mining will have on the hydrologic system." Citizen Plaintiffs' Reply at 47. Industry and the Secretary argue that the concerns expressed in the legislative history that the hydrologic balance be maintained on and off the mine site during and after the mining operation are met by the CHIA. "[A]t the time of the initial permit application, the regulatory authority considers detailed information submitted by the operator in his application, as well as general information on the hydrology of the area, to determine the probable cumulative impact of the proposed operation and anticipated mining on the hydrologic balance." Indus. Intervenors' Mem. at 44. The Secretary adds:

It is of little consequence that the applicant is not initially required to submit life-of-the-mine information in the permit application. If the regulatory authority is not provided with this information, then the regulatory authority cannot prepare the CHIA, and therefore cannot issue the permit. As a result, if the necessary information for the CHIA is not ultimately provided by the applicant, and is not otherwise available, the applicant cannot obtain permit approval under the Surface Mining Act or under the Secretary's rules.

Sec.Res. at 19.

The court will uphold the regulation if it is consistent with the Act or the record demonstrates that the rule is a rational one. First, the court does not conclude that the regulation is inconsistent with the plain language of the Act. Plaintiffs' arguments about the meaning of surface coal mining operation in §§ 701(27) and (28), and the meaning of "mining and reclamation" operation as used by the Department of the Interior are not persuasive. Nor, however, does the court find that the language of the Act *requires* that the operator's analysis be limited to the activities to be conducted during the permit period. The require-

**1530**

ment that the operator perform an analysis *"so that* an assessment can be made ... by the regulatory authority" in the CHIA could support a requirement broader than that imposed by the Secretary. This is especially so in light of the Secretary's admission that a life of the mine analysis is required by the CHIA to be performed by the regulatory authority which is called for in the very same section that calls for the PHC.

The court now turns to an analysis of whether the Secretary has articulated a rational basis for the rule as finally promulgated. Only if the court determines that the Secretary adequately considered the plaintiffs' objections when made during the comment period, and offered reasonable explanations for rejecting their view will the court uphold the Secretary. Absent an adequate explanation by the Secretary the court has no way of reviewing the determination, as the court is not in a position to weigh the competing technical arguments presented by the parties. In its memorandum the Secretary advances only one rather confusing argument to support his decision to include the life-of-the-mine analysis in the CHIA rather than in the PHC determination:

> The PHC determination, which forms the basis for the specific hydrologic reclamation plan included in the particular permit application, must analyze the detailed plans included in the permit application, such as the location and design of siltation structures. Such a level of detail is unnecessary for determining the probable cumulative impacts of the mine over its entire life and of other anticipated mining. The CHIA is a more general description of the overall impacts mining has on the hydrology of the area and the likelihood that material damage will occur. Therefore, the Secretary included the life-of-the-mine evaluation as part of the cumulative assessment of all anticipated mining.

Sec.Res. at 19. As noted above, in minimizing the consequence of the distinction, the Secretary in his memorandum points out that if the applicant does not provide the information and it is not otherwise available, then the permit cannot issue. While this latter point may suffice to explain why it is in the applicant's interest to provide the information if the regulatory authority cannot find it elsewhere, it does not serve to explain the failure to require that the applicant provide it in the first place.

The Secretary in the preamble to the final rule pointed out that the rule requires an analysis of those impacts which will last longer than the mining permit period to be analyzed in the PHC. 48 Fed.Reg. 43971 (1983). But this requirement does not address the possible need to analyze those impacts which result from activities beyond the permit period over the life of the mine. Rather, the Secretary apparently read the statute as precluding a life of mine analysis in the PHC in part due to this court's earlier holdings discussed above. *See* 48 Fed.Reg. 43964, 43971 (1983). The court has just stated that § 507(b)(11) does not preclude life of the mine analysis in the PHC. In light of this holding, the court will remand §§ 780.21(f) and 784.14(e) so that the Secretary will have an opportunity to explain why, in light of the court's ruling, the life of the mine analysis should be in the CHIA as opposed to the PHC.

E. Scope of Cumulative Hydrologic Assessments and the Definition of "All Anticipated Mining"

■ Section 510(b)(3), 30 U.S.C. § 1260(b)(3), requires that before any permit is issued, the regulatory authority must determine "the probable cumulative impact of *all anticipated mining* in the area" (emphasis added) and based on that analysis determine whether the proposed mine will materially damage the hydrologic balance. Section 507(b)(11), 30 U.S.C. § 1257(b)(11), specifies (1) that this determination is not required until such time as hydrologic information on the general area prior to mining is made available from an appropriate federal or state agency, and (2) that no permit shall be approved until this general hydrologic information is available.

Plaintiff citizen and environmental groups challenge here two aspects of the definition of "anticipated mining" included in the general definition of "cumulative impact area" at 30 C.F.R. § 701.5 to mean:

at a minimum, the entire projected lives through bond releases of: (a) The proposed operation, (b) all existing operations, (c) any operation *for which a permit application has been submitted to the regulatory authority,* and (d) all operations required to meet diligent development requirements for leased Federal coal *for which there is actual mine development information available.*

Citizen plaintiffs challenge the underlined portions of this definition as inconsistent with the plain meaning of the Act and congressional intent and as arbitrary and capricious. The Secretary and Industry respond that a proper reading of the statute reveals that the term "anticipated mining" only includes operations for which hydrologic information is available—that is, operations which are in existence or which have submitted permit applications—or in the case of federal leases mines where data is available. The court rejects the citizen plaintiffs' challenge of this rule.

First, citizen plaintiffs rely on the plain meaning of the term "anticipate" to preclude the definition promulgated by the Secretary. The court does not find that the Secretary's interpretation of terms in such a technical statute is to be dictated by resort to the everyday meaning of words, where the definition chosen by the Secretary comports with congressional intent. Further, the court agrees that the position taken by the citizen plaintiffs here relies on an erroneous interpretation of the Act. Plaintiffs contend that § 507(b)(11) expressly requires that no permit issue until information on *anticipated mining* becomes available. Reading the statute this way lends support to their view that it is in violation of the Act to define anticipated mining to mean only those mines where there is some data available. The court agrees with Industry that the *provisos* in § 507(b)(11) relate to the availability of baseline information. The statute specifi-

cally requires the CHIA and the PHC and then adds:

That this determination shall not be required until such time as hydrologic information on the general area *prior to mining* is made available from an appropriate Federal or State agency: *Provided further,* That the permit shall not be approved until *such information* is available and is incorporated into the application.

30 U.S.C. § 1257(b)(11) (emphasis added). The court does not read this section of the statute to require that where information on hypothetical operations is not yet available, the regulatory authority must find that data before approving a permit. Such a requirement would be odd in the face of the fact that § 507 merely explains what the permit seeker must put in his application, whereas § 510(b)(3) places restrictions on the regulatory authority in that it precludes the approval of a permit absent the assessment by the regulatory authority of the probable cumulative impact of all anticipated mining in the area of hydrologic balance. Further, the Industry members point to legislative history that suggests that the regulatory authority was to rely on information available to make the cumulative impact assessment. H.R.Rep. No. 1445, 94th Cong., 2d Sess. 59 (1976); *see also* H.R.Rep. No. 218, 95th Cong., 1st Sess. 113 (1977), U.S.Code Cong. & Admin. News 1977, p. 593. Finally, the Secretary points out that since any *subsequent* mining operation that seeks a permit would have to have a CHIA done, and the regulatory authority once again would have to make a determination that the operation would not materially damage the hydrologic balance, there is little danger that the method chosen by the Secretary would lead to mining that damages the hydrologic balance. At oral argument plaintiffs took issue with this contention and claimed that:

[T]he inevitable effect, Your Honor, of that approach is that either they'll reach a point where there can be no more permitting in that area even though there's economical coal seams, and coal develop-

ment will be irrationally stopped—plus in many cases the earlier mines could have been planned to take into account a particular hydrologic problem—or, and we think this is most likely, the environmental controls will be lessened to allow the mining to go forward.

Tr. Oral Arg. at 54. Whether the Secretary chose the best method for conducting long-range planning is not for this court to decide. Rather, for present purposes, the court decides that nothing in the Secretary's approach violates the Act.

Nor does the court find that the rule is arbitrary and capricious. The court has been critical of the Secretary in other areas of this litigation for failing to explain rationally his decisions. The administrative record on this rule contains an analysis of the objections in the record raised to the proposed rule which was one more to the liking of plaintiffs here. The Secretary responded to those comments by changing the ultimate rule and explaining that he was seeking to avoid the difficulty of requiring data about hypothetical mines and delaying permits interminably in the process. These concerns are expressed in the record and the Secretary responded to them in a reasonable way by tailoring the definition of anticipated mining. This is precisely the kind of technical area where the court will not substitute its judgment for that of the Secretary even if the court would conclude that a slightly broader definition might be desirable.

F. Water Source Information for Underground Mines

■ Citizen plaintiffs next complain that the Secretary's new hydrology regulations do not require the identification and *replacement* of water supplies that may be impacted by underground mines. 48 Fed. Reg. 43956 (1983). In their reply brief they recharacterize their complaint as a failure under § 508(a)(13), 30 U.S.C. § 1258(a)(13), to require information on, and *provision* of, alternative water sources where protection of the water supply of an area from *underground* mining activities could not

be assured. The Secretary's answer is, in short, that he does not require the information because the Act does not require replacement of water for underground mines.

Some background to this issue is necessary. In its 1980 opinion the court had to decide whether to uphold a regulation of the Secretary that required the replacement of damaged water supplies by underground miners. The court then rejected the Secretary's arguments that other provisions of the Act relating to hydrology gave the Secretary authority to require water replacement by underground operators. The court also said then that § 717(b), 30 U.S.C. § 1307(b), required replacement only by surface operators. May 1980 Opinion, *supra,* at 37.

In the instant case, the Secretary has abandoned his attempt to have underground operators replace water supplies, due in part to this court's holding relative to the meaning of § 717(b). Thus, citizen plaintiffs are asking the court to declare that under § 508(a)(13), 30 U.S.C. § 1258(a)(13), the Secretary *must* require underground operators to replace damaged water supplies. Thus, what the court said in 1980 the Secretary could not do under his broad rulemaking authority, the environmentalists now argue the Secretary must do under § 508(a)(13).

The court stands by its determination that § 717(b) does not require water replacement by underground operators. First, the court notes that the plain language of the section refers to surface mine operators, and that this term is nowhere defined to include underground mine operators. Thus, the definition in § 701(28), 30 U.S.C. § 1291(28), of "surface coal mining operations" does not speak to the question now before the court, both because a different term is used in § 717(b), and because it is difficult to see how even applying the definition embodied in § 701(28) would lead to the outcome that all underground mine operators must replace water supplies. Further, the court is also partially persuaded by the fact that the Secretary in his 1979 memorandum, when he *wanted*

to require replacement by underground operators, did not ever squarely state that he was relying on § 717(b) as authority for so doing. *See* Sec.Mem. (Dec. 21, 1979).

The court's holding leaves citizen plaintiffs relying on § 508(a)(13), 30 U.S.C. § 1258(a)(13). They argue that the requirements of § 717(b) are not duplicative of the requirements of § 508(a)(13):

> Section 508(a)(13) focuses on the hydrologic balance of an area; not the individual supply rights of any person from qualitative or quantitative pollution, even though a person with water *quantity* loss might indirectly benefit. The requirement stands apart from § 717 and is not modified by its provisions. Rather, the two provisions, Section 508(a)(13) and Section 717, are independent parts of a comprehensive scheme intended to "assure the maintenance of the [hydrologic] balance on and off the mining site during and after the mining operation."

Citizen Plaintiffs' Reply at 68 (emphasis in original) (quoting H.R.Rep. No. 218, 95th Cong., 1st Sess. 113 (1977)), U.S.Code Cong. & Admin.News 1977, at 646.[1] The court does not read 508(a)(13) as affirmatively requiring water replacement by underground operators, but instead is persuaded by Industry's argument that:

> § 508(a)(13) is a *permitting* and *planning* requirement, which requires information to be submitted concerning water quantity and quality protection only to the extent that the regulatory authority, pursuant to the Act's *substantive* mandates, requires such measures to be taken. This section provides no independent mandate for environmental performance.

Indus. Motion at 5 n. 4 (emphasis in original). Such a reading does not reduce § 508(a)(13) to a nullity, but merely means that the requirements of that section are

applied differently to surface miners and underground miners. In his 1979 memorandum the Secretary admitted that § 508(a)(13) might apply differently to surface and underground operators. *See* Sec. Mem. at 40 n. 7 (Dec. 21, 1979). The court is further concerned that to require information and replacement under § 508(a)(13) circumvents Congress' express wishes with regard to water replacement in § 717(b), 30 U.S.C. § 1307(b). Finally, the court notes that Congress included express hydrology standards for surface operators, § 515(b)(10), 30 U.S.C. § 1265(b)(10), and underground operators, § 516(b)(9), 30 U.S.C. § 1266(b)(9), elsewhere in the Act.

There is no question that § 508(a)(13) presents a puzzling potential contradiction with § 717(b). The court concludes, however, that the contradiction is avoided by reading § 508, in this context, to require a description of steps to be taken to implement actual performance standards in the Act.[2]

## G. Variance from the Groundwater Monitoring Requirement

■ Plaintiff citizen and environmental groups next claim that the Secretary's new hydrology regulations create a broad waiver of the requirement that a coal operator monitor the impacts of his mining operations on the groundwater quality and quantity of the area.

The new 30 C.F.R. § 780.21(i)(2) (1984), 48 Fed.Reg. 43989 (1983), states:

> (2) If an applicant can demonstrate by the use of the PHC determination and other available information that a particular water-bearing stratum in the proposed permit and adjacent areas is not one which serves as an aquifer which significantly ensures the hydrologic bal-

---

1. Section 508(a)(13) requires:
 a detailed description of the measures to be taken ... to assure the protection of: (A) the quality of surface and ground water systems, both on- and off-site, from adverse effects of the mining and reclamation process; ... (C) the quantity of surface and ground water systems, both on- and off-site, from adverse effects of the mining and reclamation process

or [the measures to be taken to] provide alternative sources of water where such protection of quantity cannot be assured.

2. Amicus Kentucky attempts to raise an independent basis of attack, not raised by the parties to this litigation. The court does not consider this independent basis of attack.

ance within the cumulative impact area, then monitoring of the stratum may be waived by the regulatory authority.

Plaintiffs claim that the regulation is illegal because it allows waivers where an aquifer serves an important local water use, and it allows a waiver where an aquifer is important to the hydrologic balance on or off the minesite, but might not be important for the *entire* "cumulative impact area."

The Secretary contends that the regulation is entirely consistent with the Act which requires monitoring of "strata that serve as aquifers *which significantly insure the hydrologic balance of water use either on or off the mining site....*" § 517(b)(2), 30 U.S.C. § 1267(b)(2) (emphasis added). The Secretary in his response declares that:

> Contrary to NWF's assertions, the rule does not allow a waiver where an aquifer serves an important local water use. The preamble to the final rule specifically noted and the Secretary interprets these rules to provide that the waiver of groundwater monitoring under 30 C.F.R. §§ 780.21(i) and 784.14(h) could only apply to water supplies of marginal use and only when other groundwater resources are available for current and future use. 48 Fed.Reg. 43974 (1983).
>
> NWF also incorrectly asserts that the rule allows a waiver where an aquifer is important to the hydrologic balance on or off the minesite but may not be important for the *entire* cumulative impact area. The rule does not allow a waiver in such situations. The preamble indicates, and the Secretary interprets these rules to provide that a waiver will not be granted unless the aquifer does not significantly ensure the hydrologic balance *anywhere* within the cumulative impact area.

Sec.Res. at 27–28 (emphasis added at "anywhere").

In their reply, the citizen plaintiffs welcome this interpretation by the Secretary but argue that it is not supported by the language of the rule and therefore absent

notice that this is the interpretation or a new, more clearly written rule, needless confusion will result. The court agrees. Nothing in the Secretary's preamble specifically relates to local use; further, the Secretary's claim in his memorandum that a waiver will not be granted if the aquifer does not significantly ensure the hydrologic balance *anywhere* within the cumulative impact area is not supported by a cite to the preamble and the court finds no such statement in the preamble. *See* 48 Fed. Reg. 43974–76. Being that the parties are in substantive agreement, there would appear to be little harm and much good that would result from a clearer repromulgation of the regulations at 30 C.F.R. § 780.21(i) and 784.14(h).

## II. Coal Mine Waste

### A. Controlled Transport of Coal Waste

■ Section 515(b)(11), 30 U.S.C. § 1265(b)(11), of SMCRA requires that coal mine and processing wastes be stabilized "through construction in compacted layers." Plaintiff citizen and environmental groups challenge 30 C.F.R. §§ 816.81(a), 817.81(a) (1984), 48 Fed.Reg. 44028, 44030 (1983), which require that coal mine waste be "placed in a controlled manner...." They argue that this provision allows for the practice of end or side dumping, which is a practice in hilly mining areas of placing material by means of gravity in a disposal site. Citizen plaintiffs claim that because of its documented dangerousness, the practice was illegal under the old regulations, and that the current regulation is unsupported by any showing in the record of its safety. Citizen plaintiffs complain that "there is no support for end dumping in the Act, the legislative history, the technical literature or the practical experience of the State [Kentucky] with more mining operations than any other in the country." Citizen Plaintiffs' Mem. at 143.

The Secretary contends first that because the Act does not require a specific method of transportation to the disposal site, he rejected the requirement found in

the former regulations that waste be "*hauled and conveyed* and placed in a controlled manner," 48 Fed.Reg. 44011 (1983) (emphasis added), and retained simply the requirement that thᵉ waste be placed in a controlled manner. The preamble to the final rule declared that "OSM ... believes it was wrong in not allowing *controlled* gravity placement of material." *Id.* (emphasis in original). The Secretary further maintained that the control requirement is supported by the legislative history. *Id.* (citing H.R.Rep. No. 218, 95th Cong., 1st Sess. 125 (1977)), U.S.Code Cong. & Admin.News 1977, 657.

Given the Secretary's admission that there was a requirement that the placement be controlled, however, the court concludes that the Secretary was under an obligation to justify in the record his departure from the previous conclusion that end or side dumping were inherently dangerous activities, even where the operator is then required to take some additional step, like spreading the piles in layers so as to minimize the flow of air through the piles. Plaintiffs point out that the old regulation not only prohibited end dumping but also required the operator to layer and compact the waste. *See* 44 Fed.Reg. 15209–10 (1979). Although the Secretary was by no means required to keep the previous standard, he was required to explain his departure from it as reasonable, and the mere use of the word "controlled"—without any standards or definition—in no way demonstrates that the Secretary has assured that the dangers being protected against under the old rule are protected against here. The rule is rejected as arbitrary and capricious.[3]

### B. Demonstration of Compaction

■ Section 515(f), 30 U.S.C. § 1265(f), requires that the Secretary "establish ... standards and criteria regulating the *de-*sign, location, *construction, operation, maintenance,* enlargement, modification, removal, and abandonment of new and existing coal mine waste piles ...." (emphais added). Plaintiff citizen and environmental groups challenge the removal of design standards relative to the degree of compaction under the old rules. The previous rules contained a 90% dry density requirement. Citizen plaintiffs argue that the Act expressly requires design standards, and thus, even if the Secretary justified removing the 90% standard, which they contend he has not, he had to at least replace it with some other design standard.

The Secretary counters that "[r]ather than include a specific compaction test, the rules impose a performance standard that all coal waste structures must be designed to achieve a minimum 1.5 long-term safety factor. 30 C.F.R. § 816.81(c)(2) (1983)." Sec.Res. at 34. The Secretary's argument essentially is that the phrase "standards and criteria regulating the design...." permits use of performance standards as long as they regulate the design. The court disagrees. If Congress was satisfied that the proper construction of waste piles could be guaranteed by resort simply to performance standards, it could have made that clear. The controversy here does not concern the general grant of rulemaking authority in a statute which then affords the Secretary the discretion to choose the type of regulation which best fits a particular situation; instead this is one of the very few provisions in the Act where Congress expressly called for design standards. In fact, when Peabody Coal challenged the use of broad design criteria under the interim program regulations, its argument was based in part on its contention that "the Act only authorizes the use of design criteria in the regulation of waste dams. 30 U.S.C. § 1265(b)(13), 1265(f)." *In Re: Surface Mining Regulation Litigation,* 456

---

**3.** The legislative history cited by plaintiffs does suggest that Congress intended the placement of the wastes in the disposal site by means other than gravity. The House Report states: "With respect to surface disposal of mine wastes in dry waste banks ... H.R. 2 requires operators to *lay* *down* and compact wastes in layers or lifts in order to prevent combustion, water pollution through leaching, and assure stability of the wastebank." H.R.Rep. No. 218, 95th Cong., 1st Sess. 125 (1977) U.S.Code Cong. & Admin.News 1977, 657 (emphasis added).

F.Supp. 1301, 1308 (D.D.C.1978), *modified,* 627 F.2d 1346 (D.C.Cir.1980). The court, then, must reject the new regulations at 30 C.F.R. §§ 816.81, 817.81 insofar as they do not carry out the Secretary's express responsibility under § 515(f) to establish design standards.[4] Although the court cannot conclude that each and every design criteria from the old rules must be kept as promulgated, the rejection of those criteria must have support in the record and be consistent with section 515(f)'s mandate. The former regulations contained a specific design criteria relative to compaction; the new regulations have rejected that in favor of a performance standard. This is in direct contravention of section 515(f) and, even if the Act leaves discretion with the Secretary for the selection of which design criteria are necessary, the failure to explain the rejection of the previous compaction standard renders the current regulations arbitrary and capricious.[5]

### C. Disposal of Coal in Greater than Two-Foot Lifts

██ The Secretary's final rule allows an operator to construct lifts exceeding two feet in thickness if such lifts are approved by the Mine Safety and Health Administration (MSHA) district manager. 30 C.F.R. §§ 816.83, 817.83 (1984), 48 Fed.Reg. 44028, 44030 (1983). The Secretary in his response memorandum explains that:

> The coal waste rules at 30 C.F.R. § 816.-83 (1983) require refuse piles to comply with 30 C.F.R. § 77.214 and 77.215 (1983), the MSHA standards for refuse pile construction. Section 77.215(h) of the MSHA regulations allows refuse piles to be constructed in lifts thicker than two feet and with a slope in excess of two horizontal to one vertical if a minimum safety factor of 1.5 will be met.

Sec.Res. at 36. Citizen plaintiffs and environmental groups complain that this is an unlawful delegation to MSHA of the Secretary's duty to establish design standards for coal mine waste piles under § 515(f), 30 U.S.C. § 1265(f). The issue here is similar to the previous issue. Once again the Secretary relies on the fact that the ultimate design must be approved by the regulatory authority, and technically justifies the greater than two-foot lift possibility by suggesting that the Secretary has adopted a performance standard: "Although lift thickness is important, it may safely exceed 24 inches if the structure can otherwise be designed to achieve a 1.5 static safety factor." Sec.Res. at 37. This reliance on a performance standard is in violation of § 515(f) of the Act.

### D. MSHA Criteria for Impounding Structures

██ Plaintiff citizen and environmental groups object to the incorporation into §§ 816.84(b), 817.84(b) (1984), 48 Fed.Reg. 44029, 44031 (1983), of the distinctions made by MSHA between sizes of coal mine waste impoundments. They complain that the Secretary has not technically justified the distinction in terms of SMCRA, which they contend is intended to serve a different purpose from the Mine Safety and Health Act. Further, they contend that the distinction, which has the effect of resulting in less scrutiny of smaller impoundments, is contrary to the requirements of the Act. The court agrees that if the Secretary is to adopt the MSHA distinctions for purposes of SMCRA he must independently consider and justify the adoption of a distinction based on impoundment size. Failure to do this results in an arbitrary classification. Such a holding is once again required by section 515(f), expressing the Secretary's duty, and by the fact that SMCRA was intended by Congress to serve

---

**4.** Although the pleadings are not entirely clear, the court will assume that the challenges to the rules at § 816 are also meant to apply to the identical regulations for underground mining found at § 817.

**5.** The court agrees with citizen plaintiffs that the requirement embodied in § 816.81(c)(1) (1984) that a professional engineer must certify the design and the method by which the design will be achieved is irrelevant in that it does not address the Secretary's responsibility to promulgate design standards.

a broader and different purpose than the MSHA. H.R.Rep. No. 218, 95th Cong., 1st Sess. 141 (1977), U.S.Code Cong. & Admin. News 1977, 673.

> Certain aspects of coal mining operations are now subject to regulation under two major Federal programs—the Coal Mine Health and Safety Act of 1969 and the Federal Water Pollution Control Act.
>
> Under the Coal Mine Health and Safety Act of 1969, as amended, the Secretary of Interior regulates certain health and safety aspects of both surface mines and surface activities of underground mines. The implementation of this act, though, has been directed at the protection of the miner while on the site of the mining operation.
>
> In several instances, H.R. 2 specifies that certain activities are to be conducted in such a way as to provide for the protection of the health or safety of the public—both on and off the minesite. For example, standards are set forth controlling the design, construction, and use of impoundments for the disposal of mine wastes. Such provisions *are not* duplicative of the Coal Mine Health and Safety Act but are supplementary to the authority granted to the Secretary of Interior by that act.

H.R.Rep. No. 218, 95th Cong., 1st Sess. 141 (1977) (emphasis added), U.S.Code Cong. & Admin.News 1977, 673.

The Secretary does not respond by pointing to a technical or legal justification for distinguishing between the two types of impoundments but rather explains that *both* have to meet various requirements and points to other requirements that maintain such a distinction. The response misses the point. It is the initial distinction based on size embodied in the MSHA regulations that plaintiffs complain has not been justified; because the Secretary has not justified the distinction, the rule must fall. 30 C.F.R. §§ 816.84(b), 817.84(b) and §§ 816.49, 817.49 are thus remanded to the extent those rules require a distinction between large and small impoundments that has not been justified by the Secretary.

**E. Failure to Coordinate with the Army Corps of Engineers**

Citizen plaintiffs further complain that the Secretary's regulations promulgated under § 515(f) failed to sufficiently involve the Corps of Engineers to the extent required by Congress. The Act at § 515(f) requires that the Secretary establish regulations "with the written concurrence of the Chief of Engineers." The Secretary claims he has complied with this requirement by pointing to a June 2, 1983 letter to the Chief of Engineers from OSM, on which the Corps of Engineers indicated its concurrence with the rules by signing a concurrence block on the letter and returning it to OSM. The court agrees. Citizen plaintiffs rely on the following House Report language:

> In order to assure that mine waste impoundments ... are constructed ... so as to safeguard the health and welfare of downstream populations, H.R.2 gives the Army Corps of Engineers a role in determining the standards for construction, modification, and abandonment of these impoundments.
>
> Authority for the issuance of regulations and inspections of impoundments rests with the Secretary of Interior; *however*, such regulations *should be developed by the Chief of Engineers.* It is the intent of the conferees that the safety, engineering and design standards of the Corps of Engineers will apply, *through* the rules and regulations of the Secretary, to such structures and waste disposal banks which may serve as temporary or permanent impoundments

H.R.Rep. No. 218, 95th Cong., 1st Sess. 125 (1977) (emphasis added), U.S.Code Cong. & Admin.News, 657. Yet, the statute plainly and simply requires written concurrence, and that the standards adopted by the Secretary conform to those of the Chief of Engineers. The Secretary has followed the mandate of the statute, and the court will not resort to the legislative history in the face of the clear wording of the statute.

**1538**

### F. Incorporation of EPA's Regulations on Hazardous Wastes

 Industry has challenged §§ 816.-89(d), 817.89(d) (1984), 48 Fed.Reg. 44030, 44032 (1983), which provide:

> Notwithstanding any other provision in this chapter, any noncoal mine waste defined as "hazardous" under section 3001 of the Resource Conservation and Recovery Act (RCRA) (Pub.L. 94–580, as amended) and 40 C.F.R. Part 261 shall be handled in accordance with the requirements of Subtitle C of RCRA and any implementing regulations.

Industry challenges this rule because it contends that Congress gave the Secretary exclusive responsibility to regulate every kind of waste at coal mines in SMCRA permits, and expressly provided that EPA's regulations for hazardous wastes under RCRA shall not be applied to coal mines.

The court need not spend much time detailing the statutory analysis because it concludes that the rule was promulgated without adequate notice and comment under the APA. As Industry points out, and the Secretary does not refute, the first notice of these rules came in the preamble to the final rule. *See* 48 Fed.Reg. 44027 (1983). Further, in the proposed rule the Secretary stated only that the disposal rules "would be slightly modified." 47 Fed.Reg. 26605 (1982).

The Secretary in his response did not respond to the Industry's APA challenge, but instead attempted to explain that the rule neither broadens nor diminishes the Secretary's rules on the disposal of noncoal waste. Industry takes a vastly different view of the effect of the regulation, and makes a lengthy argument that has nowhere been considered by the Secretary prior to this litigation. Second, Industry is able to point to legal and practical complications that result from the rules. Sections 816.89(d) and 817.89(d) are remanded to the Secretary for adequate notice and comment.

### G. Coal Waste Impounding Structures

Industry in its initial memorandum challenged 30 C.F.R. §§ 816.84(b)(1) and 817.-84(b)(1) governing coal waste impounding structures. In response to the Industry argument, the Secretary noted in his response that the "Secretary intends to propose a rule specifying that one spillway capable of safely passing the design precipitation event may be used instead of separate principal and emergency spillways." Sec.Res. at 41 n. 26. The issue is thus conceded and the Secretary should proceed to propose the above described rule.

### III. Lands Unsuitable Regulations

#### A. Petition Procedures

##### 1. *Federal Unsuitability Procedure*

 Industry challenges the Secretary's retention in 30 C.F.R. § 769 of a petition process for designation of federal lands as unsuitable for all or certain types of surface coal mining operations and for termination of previous designations. Industry argues that because Congress explicitly adopted an unsuitability petition process for state lands and did not require such a process for federal lands, the Secretary is without authority to provide for such a mechanism. The court disagrees and concludes that the Act requires a federal petition process.

First, Industry can point to no support in the legislative history that Congress did not desire a federal petition process. It places much weight on the point that the Secretary conceded in the preamble to the proposed rule that the Act does not *require* a federal petition process. To decide, however, that Congress did not expressly provide for such a process, or to decide that the Act does not require such a process, is not to decide that the Secretary has no independent authority to prescribe such a process.

Industry's argument that the presence of the state petition process set forth in § 522(c), 30 U.S.C. § 1272(c), and the federal petition process set forth in § 601, 30 U.S.C. § 1281, demonstrates a congressional intent to disallow such a process on

federal lands under § 522, is undercut both by Congress' obvious intent that there be unsuitability determinations on federal lands, as set out in § 522(b), 30 U.S.C. § 1272(b), and by legislative history relied on by the Secretary which demonstrates that Congress thought there would be a federal petition process. In promulgating the federal process the Secretary noted the following language in the Senate Report:

A decision to permit surface mining of coal is a land use decision, and as such may at times conflict with other demands on scarce or valued land resources. For this reason, *the bill provides for a mechanism—on both State and Federal lands—for citizens to petition* that certain areas be designated unsuitable for surface coal mining.

48 Fed.Reg. 41340 (1983) (quoting S.Rep. No. 128, 95th Cong., 1st Sess. 54 (1977)) (emphasis supplied by commenter). The Secretary also relied on House Report language:

The Secretary of the Interior is to review Federal lands and make some determinations based on the standards set forth above. Any person having an interest which may be adversely affected *may petition either the State or Federal Government to have an area so designated or to have a designation terminated.*

48 Fed.Reg. 41340 (1983) (quoting H.R.Rep. No. 45, 94th Cong., 1st Sess. 206 (1975)) (emphasis supplied by commenter). It is impossible to conclude, in the face of the above report language, that the absence of such a requirement, if found to exist, demonstrates that Congress affirmatively decided *not to permit* a federal petition process. The court believes that given the legislative history cited, and the Secretary's broad rulemaking authority under the Act, on which the Secretary also relied, *see* 48 Fed.Reg. 41354 (1983), it would be permissible for the Secretary to adopt such a procedure even if the Act did not require it.

The court also concludes, however, that the Secretary is required under the Act to promulgate a federal petition process. Industry's argument that the Act does not require a federal petition process relies solely on the definition of the term "regulatory authority" found at § 701(22), 30 U.S.C. § 1291(22), of SMCRA. An understanding of the Industry argument is important. Section 522(c) provides for petitions to the "regulatory authority." Section 701(22), 30 U.S.C. § 1291(22), defines the term "regulatory authority" to mean:

the State regulatory authority where the State is administering this chapter under an approved State program or the Secretary where the Secretary is administering this chapter under a Federal program.

The term "Federal program" is, in turn, defined at § 701(6), 30 U.S.C. § 1291(6):

"Federal program" means a program established by the Secretary pursuant to section 1254 [§ 504] of this title to regulate surface coal mining and reclamation operations on lands within a State in accordance with the requirements of this chapter.

Section 504, 30 U.S.C. § 1254, authorizes the Secretary to promulgate a federal program for states that have failed to come up with an approved program of their own. The effect of reading these provisions together is that the term "regulatory authority" does not include the Secretary when he is regulating mining on federal lands.

In a complex statute of this kind, the court is reluctant to depart from the plain language and definitions of the Act. On the other hand, the court's duty is to give effect to Congress' intent, and not to read the words of the statute in such a way as to contradict the plain intent of Congress. The court finds that there are two persuasive arguments which justify applying § 522(c) to the Secretary, and thus requiring a petition process on federal lands. First, citizen plaintiffs point out that the term "regulatory authority" is used in other places in the Act to refer to the Secretary when he is acting with respect to federal lands. For example, under § 509(a), 30 U.S.C. § 1259(a), of SMCRA,

the applicant for a mining permit is required to file a performance bond with the "regulatory authority." As citizen plaintiffs point out, if the term "regulatory authority" does not encompass the Secretary as the administrator of federal lands, then bonding would not be required on federal property. This is a result plainly inconsistent with the meaning of the Act, and one no court would uphold. Further, § 510(a), 30 U.S.C. § 1260(a), concerns the requirement for the regulatory authority to review and approve mining permit applications and reclamation plans. Once again, this use of "regulatory authority" must include the Secretary as manager of federal lands, or else no such approval is necessary for mining on federally-owned areas: a result flatly inconsistent with the scheme set up by Congress.

Viewed this way, then, these other uses of the term "regulatory authority" render the use of that term in § 522(c) ambiguous, and permit the court to consider the legislative history set out above which makes it abundantly clear that Congress believed that there would be a federal lands petition process. Given the remaining ambiguity in the Act, despite the definition of "regulatory authority" in the Act, the court is permitted to resort to this legislative history and find that § 522(c) requires such a federal petition process.

An answer to the above analysis is that the term "regulatory authority" in the above discussed sections does not at all require a reading different from that contained in the definition embodied in § 701(22), 30 U.S.C. § 1291(22), because §§ 509 and 510 are made applicable to federal lands—and the Secretary when he acts in relation to those lands—only through the operation of § 523(a), 30 U.S.C. § 1273(a). Following this analysis, however, provides

an alternative method for holding that the federal petition process is required under the Act. Section 523(a) dictates that

> No later than one year after August 3, 1977, the Secretary shall promulgate and implement a Federal lands program which shall be applicable to all surface coal mining and reclamation operations taking place pursuant to any Federal law on any Federal lands.... The Federal lands program shall, at a minimum, *incorporate all of the requirements of this chapter,* and shall take into consideration the diverse physical, climatological, and other unique characteristics of the Federal lands in question. Where Federal lands in a State with an approved State program are involved, the Federal lands program shall, at a minimum, include the requirements of the approved State program ... (emphasis added).[6]

Because one of the requirements of "this chapter" is the petition process, the Secretary is required to implement one under the Act. The court prefers this latter analysis, and notes that either one finds support in the direct statements in the legislative history that there would be a petition process for federal lands.[7]

While ordinarily the court would not reach this issue, having decided that the Secretary has independent authority to promulgate such a program, the court does reach the issue because the statutory base of the Secretary's rule is important in deciding whether, for example, he can then suspend unsuitability petitions required by the Act. *See infra,* III.A.2. (discussing suspension of petitions).

 Industry next attacks the Secretary's rule claiming that it was promulgated without adequate notice and comment. The court disagrees; Industry's

---

**6.** Section 523(a), 30 U.S.C. § 1273(a), also contains the proviso that the Secretary also retains his duties under § 522(b), 30 U.S.C. § 1272(b), to review federal lands to determine which are unsuitable for mining. The court does not find that this proviso affects its conclusion that the Secretary is required to retain a federal petition process.

**7.** Industry's reliance on § 601, 30 U.S.C. § 1281, to demonstrate that Congress knew how to provide for a federal petition process when it wanted to is not persuasive because by its terms, § 601, 30 U.S.C. § 1281, relates solely to non-coal mining on federal lands, and thus § 601 triggers itself, and does not depend on § 523(a) to put it into effect on federal lands.

main point is that the Secretary failed to consider the detailed statutory analysis that it set out in proposing the rule suggesting that a federal petition process is not required. The court notes that a reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

The Secretary made clear that he desired to retain the petition process because he was persuaded of the importance of public participation in the petition process and Congress' approval of the process in general. Further, the Secretary made clear his belief that the congressional reports quoted above could form the legal basis of such a process. It is true that the Secretary did not specifically state whether he believed the process is required or is simply permitted; the final rule published in the Federal Register expressly cites to the Secretary's broad rulemaking authority embodied in § 201, 30 U.S.C. § 1211. 48 Fed.Reg. 41354 (1983). The Secretary's regulations relating to the federal petition process are upheld.

Finally, Industry itself invokes § 523(a) to suggest that the procedural safeguards embodied in the state unsuitability process must also be incorporated in the federal unsuitability process. Specifically, it objects to the absence of the possibility for a hearing or other public participation embodied in 30 C.F.R. § 764.15(b)(2) (1984), 48 Fed.Reg. 41353, with respect to state programs. Further, it objects to § 769.14(a)(1) (1984), 48 Fed.Reg. 41355 (1983), to the extent that it differs from § 764.15(a)(1) (1984), 48 Fed.Reg. 41352 (1983). Section 764.15(a)(1) provides a sixty-day period for completeness review in state proceedings, whereas § 769.14(a)(1) permits only thirty days for completeness review in federal proceedings. The court is hampered in its review of these regulations by the absence of any discussion of them by the Secretary in his response memorandum; the court then, while noting that nothing in the preamble justifies these distinctions be-

tween the state and federal petition processes, will treat the issue as conceded insofar as the Secretary must justify any procedural differences between the state and federal petition processes, in order to satisfy the demands of § 523(a).

### 2. *Suspension of Unsuitability Petitions*

■ Plaintiff citizen and environmental groups along with PADER next challenge 30 C.F.R. §§ 764.15(a)(3) (1984), 48 Fed. Reg. 41352–53. (1983), and 769.14(b)(2) (1984), 48 Fed.Reg. 41355 (1983). These rules allow the consideration of unsuitability petitions to be suspended in certain circumstances by the state regulatory authority, § 764.15(a)(3), or the federal regulatory authority, § 769.14(b)(2), depending on which has jurisdiction over the land in question. Citizen plaintiffs complain that this "suspension" ignores the mandatory decision and hearing schedule set by § 522(c), 30 U.S.C. § 1272(c), of the Act. Section 522(c) of the Act requires that "[w]ithin ten months after receipt of the petition the regulatory authority shall hold a public hearing in the locality of the affected area.... Within sixty days after such hearing, the regulatory authority shall issue and furnish to the petitioner and any other party to the hearing, a written decision regarding the petition, and the reasons therefore."

Section 764.15(a)(3) permits a state to suspend a petition where the regulatory authority finds that "there is no real or forseeable [sic] potential for surface mining operations to occur." Real and foreseeable potential is defined in the rule to mean "the petitioned lands are likely to be subject to leasing or mining activity within 5 years." Section 769.14(b)(2) allows the federal authority to suspend a petition where it is deemed not ripe. Ripe is defined to include petitions relative to lands that are:

(i) subject to a Federal coal lease; (ii) included in a tract for which land use planning has been completed and which

tract is available for further consideration for Federal coal leasing; (iii) not required to be leased because the mineral rights are not owned by the United States or are owned by the Tennessee Valley Authority; or (iv) over unleased Federal coal and are subject to surface disturbances from neighboring surface coal mining operations.

30 C.F.R. § 769.14(a)(3) (1984), 48 Fed.Reg. 41355 (1983). In the preamble to the final rule the Secretary explained the purpose of the above rules:

This concept will allow regulatory authorities to set a time frame for evaluating petitions in relation to the likelihood of mining activity. Unless regulatory authorities can limit their evaluation of petitions to areas where mining is likely to occur within a reasonable period of time, they could be obligated to process unsuitability petitions immediately for which a clear need could not be shown.

48 Fed.Reg. 41330–31 (1983).

The citizen plaintiffs complain that the suspension rules are nowhere suggested in the Act or the legislative history and should not be added for the sake of bureaucratic convenience. They argue that "[t]he time periods for agency action on citizen petitions contained in Section 522(c) demonstrate a Congressional concern for timely decisions on citizen petitions without regard to whether there is a 'clear need' for processing the petition." Citizen Plaintiffs' Mem. at 72 (citing *Utah International v. Department of the Interior*, 553 F.Supp. 872, 883 (D.Utah 1982) ("in setting the time limits in § 1272(c) Congress was most interested in preventing administrative moratoria")).

PADER argues that the suspension rules violate the purpose of the unsuitability petition process which is to promote long-range planning for the protection of certain values. The provision was intended to help industry by pointing out in advance of an operator's decision to apply for a permit which areas cannot be mined because they have been designated unsuitable. Citizen plaintiffs add that under the designation process such decisions were to be made on an area by area basis, rather than a site by site basis, which the new rule encourages by waiting until mining is imminent. *See* H.R.Rep. No. 218, 95th Cong., 1st Sess. 95 (1977), U.S.Code Cong. & Admin.News 1977, 631. In addition, PADER argues that the designation process is separate from the permitting process, and that grafting a requirement of imminent mining activity onto the designation process before a petition can be considered impermissibly joins the two considerations.

PADER also argues that the rules are arbitrary and capricious in that they were promulgated without adequately addressing significant comments made by three states during the comment period. Further, they claim that the rule is arbitrary and capricious in that there is absolutely no showing in the record of any such need for the rule, and that because there is no system for determining when mining or leasing is likely to occur within five years, it is too burdensome for the states to carry out.

The Secretary responds that the time limits in the bill were placed there primarily to protect operators from lengthy delays caused by the *processing* of petitions: "In order to prevent moratoria caused by administrative delay, section [1272(c)] requires the regulatory authority to issue a decision on any designation petition within 12 months." S.Rep. No. 128, 95th Cong., 1st Sess. 94 (1977). PADER essentially concedes this purpose in its memorandum. In their reply the citizen plaintiffs argue that there is nothing in the legislative history to suggest that *only* industry was to benefit from § 522(c)'s command that administrative moratoria be avoided.

The Secretary further argues that the current rule protects the interests of both the operators and the petitioners because once the petition is ripe, it must be acted on within the appropriate time frame. This is a practical approach, the Secretary argues, because

[u]ntil there is a foreseeable possibility that coal mining may occur in an area, it is pointless to expend the time and re-

sources necessary to process a petition seeking to declare that area unsuitable for mining. Determinations of unsuitability are land use planning decisions which require the development of an extensive data base and inventory, as well as public participation, and involve governmental planning at the local, State and Federal levels.

Sec.Res. at 50.[8]

Finally, the Secretary argues that the citizen plaintiffs have pointed to no harm that can result from the rule. There can be no permit granted with respect to an area which is the subject of a suspended petition, and the petitioner can seek a review from time to time to determine whether the petition has become ripe.

Defendant Intervenors Pennsylvania Coal Mining Association/MARC argue that the Secretary promulgated the rule to enable the Secretary to reconcile the time limits in § 522(c) with the provisions of § 522(a)(1) that requires a state to establish "a planning process enabling objective decisions based on competent and scientifically sound data and information." MARC argues essentially that there cannot be an objective decision if there is no potential miner with a foreseeable interest in mining to protect that decision. Similarly, the Secretary argues that the regulation "helps to ensure that all interested parties zealously represent their own interests...." Sec. Res. at 51. PADER counters, however, that this argument is not supported by the record either and constitutes therefore a *post hoc* rationalization that the court is not permitted to consider.

The court begins its analysis by noting that the language of the statute does not expressly permit the suspension of petitions. This does not mean, however, that the Secretary is without some independent authority to promulgate the rule as long as it is not inconsistent with the statute. The

court is persuaded that the purpose of the unsuitability designation does not in any way depend on the imminence of mining, but rather concludes that the scheme set up in § 522 is one separate and distinct from the other sections of the Act relative to the permitting process, performance standards, etc. The House Report language is persuasive:

It should be noted that the designation process is structured to be applied on an area basis, rather than a site by site determination which presents issues more appropriately addressed in the permit application process. The committee believes that the area by area approach of section 522 thus serves the industry since such a process may, in advance of application, identify lands which are either not open to surface mining or where surface mining is subject to restrictions.

H.R.Rep. No. 218, 95th Cong., 1st Sess. 95 (1977) U.S.Code Cong. & Admin.News 1977, 631. In addition, although all parties point to the purpose of the provision as avoiding de facto designation through a long drawn out process, the plain language refutes a notion that *only* coal miners were intended to benefit from the requirements that the determination be made expeditiously. The court concludes that 30 C.F.R. § 764.15(a)(3) and 30 C.F.R. §§ 769.14(a)(3) and 769.14(b)(2) must be struck down as inconsistent with law.

The court is further persuaded that the reasoning given by the Secretary does not provide a rational basis for 30 C.F.R. § 764.15(a)(3). First, there is no reference in the record to states being burdened by having to make unsuitability determinations prior to foreseeable mining. Second, while the rationalizations advanced by the Secretary in his memoranda and by MARC do perhaps support the Secretary's determination, they are not found in the preamble of the final rule and cannot justify the

---

8. The Secretary further argues that because mining technologies may change, a decision made far in advance of any possibility of mining may be obsolete by the time the mining becomes near a reality. In its reply, however, PADER points out that this reasoning was not in

the preamble of the final rule and therefore cannot be relied on to justify it. Citizen plaintiffs also refute this argument by pointing out that the Act takes care of the change in technology possibility by allowing someone to petition to *terminate* an unsuitability designation.

final rule. Finally, the Secretary did not respond to significant comments made by several states to the effect that the rule was unworkable. Thus, the rule must also be struck down because it is arbitrary and capricious.

**B. Hearing Procedures under § 522(c)**

■ Both Industry and citizen plaintiffs challenge the hearing procedures contained in 30 C.F.R. § 764.17(a) and 769.17(a) (1984), 48 Fed.Reg. 41353, 41356 (1983), when an unsuitability petition is filed under § 522(c). Industry claims once again that the Act requires a full adjudicatory hearing in accord with 5 U.S.C. § 554; citizen plaintiffs, on the other hand, contend that because the Act does not call for an adjudication, the Secretary is powerless to provide for cross-examination or other procedural safeguards. The court finds that the Secretary's rule should be upheld in all respects and rejects the challenge of both citizen plaintiffs and Industry.

First, the court reaffirms its earlier holding that § 522(c) does not require that adjudicatory procedures be used. The reasoning is amply set out in this court's opinion in *In Re: Permanent Surface Mining Regulation Litigation I,* slip op. at 24–25. (D.C.C. Feb. 1980). Another court has more recently come to the same conclusion. *See Utah International v. Department of the Interior,* 553 F.Supp. 872, 881 (D.Utah 1982).

Having decided that § 522(c) does not require formal rulemaking, the court is of the opinion that a decision by the agency to add certain elements of formal rulemaking lies within the agency's and not the court's discretion. *Vermont Yankee Nuclear Power Corp v. NRDC,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978) ("administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties"). The only argument advanced by citizen plaintiffs attacking the added procedural safeguards is that the Secretary is without authority to go beyond the specific procedural devices mentioned in the Act. The court believes that the Secretary has ample authority to go beyond the words of the statute in fashioning the particulars of the unsuitability hearing process.

**C. Definition of Substantial Legal and Financial Commitments**

■ Section 522 of SMCRA establishes a process through which mining may be limited or prohibited if an area is designated as unsuitable for surface coal mining. For example, the process could be used to prohibit mining if the operation would affect fragile lands in such a way as to result in significant damage to certain values. *See* § 522(a)(3)(B), 30 U.S.C. § 1272(a)(3)(B). Section 522(a)(6), however, contains the following exemption:

> The requirements of this section shall not apply to lands on which surface coal mining operations are being conducted on August 3, 1977, or under a permit issued pursuant to this chapter, or where substantial legal and financial commitments in such operation were in existence prior to January 4, 1977.

In order to implement this exemption relative to the term "substantial legal and financial commitments" ("SLFC"), the Secretary prescribed the following definition:

> Substantial legal and financial commitments in a surface coal mining operation means significant investments that have been made on the basis of a long-term coal contract in power plants, railroads, coal-handling, preparation, extraction or storage facilities and other capital-intensive activities. An example would be an existing mine, not actually producing coal, but in a substantial stage of development prior to production. Costs of acquiring the coal in place or the right to mine it without an existing mine, as described in the above example, alone are not sufficient to constitute substantial legal and financial commitments.

30 C.F.R. § 762.5 (1984), 48 Fed.Reg. 41351 (1983). Industry challenges the definition of substantial legal and financial commit-

ments. The thrust of its argument is that it is too narrow and rigid to define the universe of circumstances in which the term should apply. Requiring an existing mine and a long-term coal contract are the predominant features of the definition to which Industry objects. For example, it argues that the acquisition of coal rights along with feasibility studies could represent enormous costs and therefore SLFC.

Industry begins by arguing that the term should be read broadly since § 522 is an exception to the general method of controlling mining in the Act and contains a severe sanction of prohibition in these cases—refusing to allow mining even under the strict environmental protections of the Act. This is not persuasive. Section 522 by its existence supports a view that there are certain situations in which other values take precedence over the value of fully developing the nation's coal resources.

Second, it argues that to restrict the definition to existing mines, duplicates another one of the exemptions contained in § 522(a)(6) which exempts "lands on which surface coal mining operations are being conducted on August 3, 1977." This argument is not persuasive because the Secretary's definition of SLFC clearly encompasses cases where mining operations are not yet being conducted and no coal is being produced.

Third, Industry argues that significant legislative history is being ignored. It claims, for example, that the traditional report language relied on by the Secretary as the basis for this definition does not mandate the definition chosen but was merely intended to be illustrative, and therefore should not have set the outer bounds of the definition. That language, which is persuasive that the Secretary's definition is proper, declares:

> The phrase "substantial legal and financial commitments" in the designation section and other provisions of the act is intended to apply to situations where, on the basis of a long-term coal contract, investments have been made in power plants, railroads, coal handling and storage facilities and other capital-intensive activities. The Committee does not intend that mere ownership or acquisition costs of the coal itself or the right to mine it should constitute "substantial legal and financial commitments."

H.R.Rep. No. 218, 95th Cong., 1st Sess. 95 (1977), U.S.Code Cong. & Admin.News 1977, 631.

Industry relies also on the legislative history of other provisions of the Act that used the term SLFC. Industry claims that since the report language relied on by the Secretary is attempting to define SLFC in § 522 as well as in the other sections of the Act, then evidence of the meaning of the term in those other sections is helpful in determining what the term should mean in § 522(a)(6). Thus, it points to legislative history relative to § 510(b)(5) which would support a view that the term should include situations in which a mine is planned and for which "millions of dollars in exploration, land and mineral acquisition, and planning activities have been expended...." H.R.Rep. No. 218, at 184, U.S.Code Cong. & Admin.News 1977, 714 (concurring views of Representatives Ruppe, Clausen, Young, Johnson and Lagomarsino). In another context, Industry refers to an understanding that the term could encompass situations where lands "have been bought, they have been leased by companies, or people have entered into arrangements." 123 Cong.Rec. 15755 (1977). Finally, they claim that the history of § 601 of the bill supports a broader interpretation of the term.

Nonetheless, none of the legislative history with regard to other provisions of the bill can possibly be read to contradict or narrow Congress' plain expression of intent in the various reports relied on by the Secretary. The *most* that Industry's arguments suggest is that the term could have been written somewhat broader to take into account other circumstances that would constitute SLFC but that were not expressly mentioned in the committee language.

Industry also argues that SLFC was intended by Congress to avoid takings, and that as such the test established fails to "comport with even the broad outline of major Supreme Court precedent" on takings. Indus. Mem. at 79. It also contends that the provision violates the contract clause and the due process clause in cases where pre-SMCRA coal development rights have been conferred by lease or contract. As the government and citizen intervenors point out, however, this court has previously declined to consider such constitutional aspects of the Secretary's rules outside of a factual setting necessary to their resolution. Perhaps in recognition of this limitation, Industry in its reply counters that it is not mounting a constitutional attack on the definition, but rather is arguing that since Congress intended to avoid takings by including the provision in § 522(a), the definition must be drawn to avoid takings. In making a congressional intent argument, however, Industry has a grave difficulty dealing with the report language on which the Secretary relies, which suggests at least that Congress was satisfied that the restrictions it suggested in the definition of SLFC were sufficient to avoid takings. Industry would have the court turn this problem on its head, and say that since Congress wanted to avoid takings in this regard, it must not have meant what it said in the various committee reports about the definition of SLFC. This the court will not do, even if it were clear, which it is not, that Congress intended this provision to avoid takings.[9]

Finally, Industry relies on the argument that SLFC and VER were meant to be synonymous. It relies entirely on a change of language in § 601 as it passed through the House, and the remark of Congressman Udall that the intent of that provision was to remain the same. This is not sufficient to overtake the express intention with respect to SLFC mentioned in the Commitee reports. The court notes that Industry in arguing that § 717(b) should not apply to underground mining argued in 1979 that failure to use a particular defined term necessarily expressed an intent to give the term used a different interpretation. Industry would have the court conclude that the two terms are identical based on one statement in the legislative history with regard to a change of language in a section other than § 522—the section at issue here. This the court will not do.

Rather, the court is persuaded, with one exception noted below, that the definition as promulgated has much support in the legislative history that practically mirrors the language chosen by the Secretary to define the term. This language is quoted above and nearly identically straightforward language is found in several reports throughout the legislative history. *See* H.R.Rep. No. 896, 94th Cong., 2d Sess. 47 (1976); H.R.Rep. No. 45, 94th Cong., 1st

---

**9.** Industry is never able to point to anything in the legislative history to support its view that SLFC must be defined so as to preclude a taking in any and all instances. Its legislative history discussion of § 510(b)(5) is a compilation of quotes regarding the various types of financial commitments that should be protected under the proposed SLFC exemption in that section of the Act. Similarly, its discussion of § 601—which substituted the term "valid existing rights" ("VER") for substantial legal or financial commitments merely makes the point that designations under that section are not to interfere with valid existing rights and that this was the intent when the section included SLFC. 120 Cong.Rec. 25240. Finally, Industry points to Senate Report language that the "Committee firmly believes that all valid existing property rights must be preserved, and has no intention

whatsoever, by any provision of this bill, to change such rights." S.Rep. No. 28, 94th Cong., 1st Sess. 178 (1975). Industry's argument then is that Congress chose two distinct terms to define the same concept. Even accepting the conclusion that Congress intended SLFC to have a meaning identical to VER points more to a conclusion that in defining VER, the Secretary should have looked to the oft-repeated SLFC definition for guidance, than it does to the conclusion that SLFC must always be defined to avoid a taking.

In short, at most, Industry's SLFC legislative history argument supports a view that the Secretary's definition could have been broader than the one he chose. As noted above, however, the court cannot say that the Secretary's definition is unreasonable or contrary to law.

Sess. 91 (1975); S.Rep. No. 402, 93d Cong., 1st Sess. 68 (1973).[10]

With such express legislative history relating to the definition of the term as used in § 522, resort to other provisions, such as the meaning of SLFC in §§ 510 and 601, is not so persuasive as to convince the court that the Secretary's definition is unreasonable or contrary to law. The court does not, however, uphold the regulation entirely. At oral argument counsel for the government explained that the use of an existing mine is simply an example of a situation where SLFC will be found. In his memorandum the Secretary stated flatly that "the definition is not limited to existing coal mines. The reference to existing mines in the definition is, by its terms, an example." Sec.Res. at 60. The language suggests otherwise. Thus, the court will remand the rule to the Secretary for the narrow purpose of clarifying his position that an existing mine is not necessary for SLFC.

### D. Contents of Unsuitability Petitions

■ Citizen plaintiffs challenge four aspects of the rules relating to the contents of unsuitability petitions. Section 522(c), 30 U.S.C. § 1272(c), of SMCRA makes the following reference to unsuitability petitions:

Such a petition shall contain allegations of fact with supporting evidence which would tend to establish the allegations.

#### 1. *Evidence for All Lands*

Citizen plaintiffs challenge 30 C.F.R. § 764.13(b)(1)(v) (1984), 48 Fed.Reg. 41352 (1983), which requires petitioners to provide allegations of fact and supporting evidence "covering all lands in the petition area, which tend to establish that the area is unsuitable for all or certain types of

surface coal mining operations, pursuant to specific criteria of sections 522(a)(2) and (3) of the Act...." Citizen plaintiffs complain first that such a requirement allows a petition to be rejected as incomplete if the petition only has supporting evidence for a part of the petition area. Second, they complain that the rule prohibits the use of the "representative areas" or "similar sampling techniques." Citizen Plaintiffs' Mem. at 64.

The Secretary responds that the use of sampling and analysis of representative areas is not proscribed by the rule, but that

[t]he rule only requires petitions to be rejected with regard to those portions of the petition areas for which *no* supporting evidence was available. The rule does not specify what kinds of evidence may be submitted and does not foreclose the use of evidence from a representative area or the use of a study of a representative area which provides support for the validity of the allegations as to the entire area. The rule would preclude the processing of petitions as to areas for which the area is not representative and no other evidence is submitted.

Sec.Res. at 64–65 (emphasis in original). In their reply citizen plaintiffs express their satisfaction with this position and ask the court to bind the Secretary to this position. The court will uphold the Secretary's rule based on the above representation made in this litigation.

#### 2. *Assumption of Contemporary Mining Practices*

Citizen plaintiffs further complain that the rules at 30 C.F.R. § 764.13(b)(1)(v) and § 769.14(a), by cross-reference to § 764.-13(b), require a petitioner to assume that "contemporary mining practices required under applicable regulatory programs

---

**10.** As early as 1973 the Senate Report on S.425, a predecessor of the ultimate SMCRA contained the following language:

Mere ownership of the coal resource with the intent to surface mine would not qualify for the exemption from designation as unsuitable for surface mining based on "firm plans for and substantial legal and financial commit-

ments." In order to preclude designation, it must be established that specific plans and specific contracts for sale of coal and purchase of necessary equipment for an actual mining operation were in existence on the date of enactment.

S.Rep. No. 402, 93d Cong., 1st Sess. 68 (1973).

would be followed if the area were to be mined." Citizen plaintiffs complain that the term "contemporary mining practices" is not defined in the regulations, and they express concern that a regulatory authority can dismiss an unsuitability petition without the benefit of the statutorily mandated hearing because the regulatory authority disagrees with what petitioner alleges will be the mining practice.

The court notes that judicial review under § 526(e), 30 U.S.C. § 1276(e), is available if and when a problem develops over the meaning of the term "contemporary mining practices" with regard to an unsuitability petition.

In the preamble to the final rule the Secretary explained:

> OSM is adding a requirement that the petitioner assume contemporary mining practices required under the applicable regulatory program will be followed. That is, any mine would have to meet the requirements of the Act; a petitioner may not assume mining impacts that would be prevented by the environmental protection requirements mandated by the Act.

48 Fed.Reg. 41328–29 (1983). The court is not persuaded that the Secretary's exercise of discretion in deciding the contents of petitions violates the requirements of the Act or is unreasonable.

### 3. Frivolous Petitions

Citizen plaintiffs next challenge 30 C.F.R. §§ 764.15(a)(4), 48 Fed.Reg. 41353 (1983), (for state petitions) and 769.14(a), 48 Fed.Reg. 41355 (1983), (for federal lands petitions). These regulations permit dismissal of petitions prior to the § 522(c) hearing if they are frivolous. A frivolous petition is defined as one in which "the allegations of harm lack serious merit." §§ 764.15(a)(4), 769.14(a)(4)(i). In both cases when a petition is rejected because it is frivolous the regulatory authority or OSM is to reject the petition with a written statement of reasons and advise the petitioner that the petition may be reconsidered

upon resubmittal with deficiencies cured. §§ 764.15(a)(4), 769.14(b)(1).

Citizen plaintiffs characterize this as an additional obstacle in the petition process. They claim that the procedure is not authorized by the Act and thwarts Congress' directive that petitioners who meet the requirements of § 522(c) are entitled to a hearing. They claim that Congress in the Act set as the threshold for a hearing merely that a petition contain "allegations of facts with supporting evidence which would tend to establish the allegations."

The Secretary responds that the "lacking serious merit" provision clarifies the statutory requirement that petitions be supported by evidence, and is a proper exercise of the Secretary's broad rulemaking authority. Further, the Secretary points out that the legislative history supports the Secretary in promulgating a rule that eliminates frivolous petitions:

> The fear that blanket moratoria [on mining] will occur is unfounded for two reasons.... Second, [the Act] contains specific requirements for petition[s]. The Secretary is required to issue regulations defining those petitions to be considered valid, to preclude frivolous requests.

S.Rep. No. 28, 94th Cong., 1st Sess. 189 (1975). Even citizen plaintiffs point to language from the 1977 Senate Report:

> Each study for designation is made only on a case by case basis upon specific petition. In addition, S. 7 contains specific requirements for petition. The Secretary is intended to issue regulations defining those petitions to be considered valid, to preclude frivolous requests.

S.Rep. No. 128, 95th Cong., 1st Sess. 93–94 (1977), quoted in Citizen Plaintiffs' Reply at 27. The gist of citizen plaintiffs' complaint is that defining "frivolous" to include petitions where the allegations of harm lack serious merit is too broad in that it is much broader than what the term "frivolous" implies because it calls for an actual evaluation on the part of the regulatory authority. The court does not believe that construing frivolous to include allega-

tions of harm which lack serious merit is unreasonable.

The court does not conclude that the Secretary has overstepped the statutory requirements in permitting the rejection of frivolous petitions or in defining the term frivolous within those regulations that are challenged here. Once again, the court notes that review by the Secretary or, if necessary, by the courts, will protect against abuse of the device.

#### 4. *Permitting States to Ask for Additional Information*

Citizen plaintiffs next challenge 30 C.F.R. § 764.13(b)(2) (1984), 48 Fed.Reg. 41352 (1983), which states that:

> The regulatory authority may request that the petitioner provide other supplementary information which is readily available.

Citizen plaintiffs complain that the rule would too easily permit a rejection of the petition as incomplete for failure to provide the additionally requested material. In response the Secretary represented that "failure to respond [to such a request] does not make petitions incomplete." Sec.Res. at 70. In their reply citizen plaintiffs, noting the Secretary's representation, asked the court to bind the Secretary to such an interpretation. On the basis of the Secretary's representation, the court will uphold the Secretary's allowance for requests for additional information under 30 C.F.R. §§ 764.13(b), (c)(1) and (c)(2).

#### E. Rules Governing Designation Standards

■ Industry has challenged three definitions in the unsuitability area: the definitions of "historic lands," "natural hazard lands," and "fragile land." The court will consider each challenge in turn.

Section 522(a)(3), 30 U.S.C. § 1272(a)(3), of SMCRA provides:

> Upon petition pursuant to subsection (c) of this section, a surface area may be designated unsuitable for certain types of surface coal mining operations if such operations will—

> . . . .

> (B) affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems; or

> . . . .

> (D) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.

One thread that runs through Industry's arguments with respect to these definitions is Industry's contention that "[a]n unsuitability designation is an extreme regulatory sanction." Indus.Mem. at 91. It further points to language in the Congressional Record that § 522(a)'s unsuitability categories were intended to be "narrow so that it is unlikely that large coal resource areas would be so designated." 120 Cong.Rec. 20340 (1974), and that instead the Secretary's definitions broaden the scope of the categories so as to encompass the entire country. As to the first claim, which is not supported by any citation to the legislative history, the court notes that the unsuitability process is not at all described in the Act as a sanction; further, given the various purposes of the Act, which are sometimes difficult to reconcile, it seems inconsistent with those purposes to characterize the unsuitability process as a sanction. In any event, whether characterized as a sanction or not, Industry's contention does not detract from the Secretary's authority to promulgate reasonable rules under the Act. Finally, this court does not conclude that the definitions promulgated by the Secretary broaden the unsuitability criteria impermissibly.

#### 1. *Definition of "Historic Lands"*

Industry first challenges the Secretary's definition of historic lands found at 30 C.F.R. § 762.5 (1984), 48 Fed.Reg. 41351 (1983):

> *Historic lands* means historic, cultural, and scientific areas that could be damaged beyond an operator's ability to re-

pair or restore, or be destroyed by surface coal mining operations. Examples of historic lands include archeological and paleontological sites, sites listed on or eligible for listing on a State or National Register of Historic Places, National Historic Landmark sites, sites having religious or cultural significance to native Americans or religious groups, and sites for which historic designation is pending.

Industry objects to the inclusion of sites "eligible" for listing on either a State or National Register of Historic Places. Second, it challenges that portion of the regulation that would include sites for which "historic designation is pending." The thrust of Industry's argument is that "the Secretary's regulation permits the prohibition of mining on 'historic' properties which have not been determined to be historic." Indus.Mem. at 91.

The Secretary responds that the definition is within the Secretary's discretion in implementing the statute. The court agrees. As the Secretary points out, there is nothing that Industry can point to in the Act or the legislative history to suggest the Secretary must give the term the definition Industry prefers. Further, it is not unreasonable to protect lands in this context which are in the process of possibly being declared historic. To do otherwise would run the risk of damaging lands before such a determination could be made. Nothing in the Act calls for the formalistic approach advocated by Industry. Industry's challenge to the definition of "historic lands" is rejected.

### 2. *Fragile Lands*

Section § 762.5 (1984), 48 Fed.Reg. 42351 (1983), defines fragile lands:

*Fragile lands* means geographic areas containing natural, ecologic, scientific, or esthetic resources that could be damaged beyond an operator's ability to repair or restore or be destroyed by surface coal mining operations. Examples of fragile lands include valuable habitats for fish or wildlife, critical habitats for endangered or threatened species of animals or plants, uncommon geologic formations, National Natural Landmark sites, areas where mining may result in flooding, environmental corridors containing a concentration of ecologic and esthetic features, areas of recreational value due to high environmental quality, and buffer zones adjacent to the boundaries of areas where surface coal mining operations are prohibited under section 522(e) of the Act and part 761 of this chapter, if those areas have characteristics requiring additional areal protection or if the buffer zone itself contains fragile resources.

Industry claims that in promulgating this rule the Secretary has exceeded the statutory limits in three respects. First, it contends that including "ecologic" resources is inconsistent with the statute because the word is nowhere used, and it is not clear what the word means. Industry fears that the term "ecological" is so broad as to include possibly all the lands in the country.

Industry next challenges the inclusion of "environmental corridors containing a concentration of ecologic and esthetic features" and "areas of recreational value due to high environmental quality." Industry argues that these terms are vague and unclear. It argues that "environmental corridors" are not mentioned in the Act or its legislative history. Further, it argues that "recreational value" is not one of the criteria selected by Congress for the evaluation of fragile and historic lands.

Industry's argument mistakes the role of the Secretary in exercising his rulemaking authority to define terms not defined in the Act. The Secretary is in no way restricted to words used in the Act or the legislative history. To so restrict the Secretary would mean that the definitions could only mirror the statute and never go beyond the words used there. The court finds that the language of the provision itself is rather broad in that it allows a grant of unsuitability if an operation will affect fragile lands in which such operations could result in significant damage to important "histor-

ic, cultural, scientific, and esthetic values and natural systems." Congress' use of these terms acts as an implicit delegation to the Secretary to further define them. The Secretary's definition does not stray so far from this language that the court can conclude that it is inconsistent with law or in any way beyond his authority.

Industry has framed its complaint against the definition of "fragile lands" in terms of its lacking statutory support, thus it does not appear to the court that it is challenging the rules as arbitrary and capricious in that its comments were inadequately addressed in the preamble. Even if the court were to construe Industry's challenge as encompassing such a claim, however, the court finds that the rule is not arbitrary and capricious. First, in its reply brief Industry declares, in the context of the *Montana v. Clark* timeliness argument,[11] that "Indeed, in the preamble to the final rules, the Secretary directly rejected each of the arguments raised in industry's initial brief, stating that he would retain the terms 'ecologic,' 'environmental corridors,' and 'buffer zones' in the definition of fragile lands." Indus. Reply at 24. Second, Industry complained of the Secretary's use of the term "ecologic." The Secretary responded that it believed the meaning of the term "is generally understood and has decided to retain it." 48 Fed.Reg. 41326. In its initial memorandum, Industry complains that this response is insufficient because it fails to explain why "it was necessary or appropriate to use a 'generally understood' term that appears nowhere in the Act or its legislative history." Indus. Mem. at 88. In one sense, Industry asks too much. First, it complains that the terms used by the Secretary to define a set of terms undefined in the Act are themselves undefined. Following this analysis to its logical extreme would result in infinite definitions of any

one term. Next, it complains that the Secretary's definition was inadequate because the explanation did not anticipate criticisms of the explanation and then respond to them. While this should be done to some extent, the court does not find that the Secretary's definition here renders the rule arbitrary and capricious. Finally, however, the court is persuaded that the context of the Secretary's preamble reveals that the Secretary did, in fact, provide more of an explanation than Industry suggests. The Secretary defined the term "ecologic" and explained that although petition decisions are to be made on a case-by-case basis, some standard is needed to assist regulatory authorities. 48 Fed.Reg. 41326 (1983).

Further, the Secretary adequately responded to comments relating to "environmental corridors ..." and "areas of recreational value...." These are listed in the section of the rule providing examples. The Secretary explained that he was retaining the examples at the request of those who found them helpful, and that the examples were not all-inclusive, but were "intended to assist States, petitioners and operators in interpreting the Act's use of the phrase 'fragile lands.'" *Id.* The only remaining complaint is that the Secretary did not explain why the inclusion of any extra-statutory categories is necessary. The court believes that the above explanations are adequate, in that they demonstrate that the Secretary thought that defining the terms would be helpful to those who will need to apply them. The inclusion of these terms is not arbitrary and capricious.

Finally, with respect to the definition of "fragile lands," Industry complains that in including "buffer zones" adjacent to the boundaries of areas where surface mining is prohibited under § 522(e), the definition arbitrarily includes lands not themselves fragile. Industry complains that Congress expressly rejected an amendment that

---

11. The Secretary first argues that this challenge is untimely under *Montana v. Clark,* 749 F.2d 740 (D.C.Cir.1985). He points out that "[s]ince 1979, the Secretary's definition of the term 'fragile lands' has included the protections as described above and the surface miners brought

no challenge at that time, thus the challenge is time barred." Because the court decides that the Secretary's definitions are consistent with the statute and not arbitrary and capricious, this argument need not be reached.

would have added the type of protection to areas around protected § 522(e) areas that the reference to "buffer zones" in the definition implies. The court disagrees that the Secretary has extended any automatic protection to buffer zones. The definition includes buffer zones as an example of fragile lands and clearly states that such areas are to be protected "if those areas have characteristics requiring additional areal protection or if the buffer zone itself contains fragile resources." 30 C.F.R. § 762.5. In the preamble to the final rule, the Secretary indicated that "buffer zones do not automatically qualify as fragile lands." 48 Fed.Reg. 41326 (1983). Further, the preamble to the former rule stated that the rationale for including such a reference in the definition is to ensure "that areas around national parks and other section 522(e) areas not be overlooked as fragile lands." *Id.* (quoting 44 Fed.Reg. 14996). The Secretary's definition of fragile lands will be upheld.

### 3. *Natural Hazard Lands*

Finally, Industry objects to the definition of "natural hazard lands" at 30 C.F.R. § 762.5, 48 Fed.Reg. 41351 (1983). That definition declares:

> *Natural Hazard Lands* means geographic areas in which natural conditions exist which pose or, as a result of surface coal mining operations, may pose a threat to the health, safety or welfare of people, property or the environment, including areas subject to land slides, cave-ins, large or encroaching sand dunes, severe wind or soil erosion, frequent flooding, avalanches and areas of unstable geology.

Industry complains that this definition contravenes the Act which declares that unsuitability determinations may be made where surface coal mining operations will

(D) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.

§ 522(a)(3)(D), 30 U.S.C. § 1272(a)(3)(D). The gist of Industry's complaint is that the language of the Act expressly limits petitions based on effects to natural hazard lands to those operations which "could substantially endanger life or property." *Id.* Industry argues that the rule is much broader than this because it defines such lands to include those which merely "pose or ... may pose a threat" to people or property. To read the phrase "substantially endanger life and property" as being significantly different in meaning from the phrase "pose a threat to the health, safety or welfare of people, property or the environment," is to draw a fine line that the Secretary was not required to draw. First, the court notes that the Act refers to situations which *could* substantially endanger life or property; there is no requirement that the regulatory authority make a finding of actual danger. Viewed this way, the statutory language is broad enough to encompass threats to life and property. Further, Industry argues that the rule is written so that if the natural hazard land is dangerous, without reference to the mining operation, then it too might be considered in an unsuitability petition. This it argues is contrary to the Act which is predicated on the effect that the *operation* will have on the natural hazard. The court does not think it is unreasonable to promulgate a rule based on the assumption that surface mining on land that already, without the operation poses a threat to life and property, may continue to pose such a threat when mining takes place there. Further, the court is convinced that the categories of land chosen do not render the Secretary's definition unreasonable. The Act refers to threats to persons *and* property. Even if this court were to write a different definition than the Secretary, the court does not conclude that the Secretary's rule is an unreasonable construction of the statute. The definition is upheld.

### F. Material Damages in Buffer Zone Areas

■ Plaintiff citizen and environmental groups next challenge 30 C.F.R. §§ 761.-

11(d), (e), (f), and (g). Sections 522(e)(4) and (e)(5) of SMCRA, 30 U.S.C. §§ 1272(e)(4), (e)(5) provide that after August 3, 1977 and subject to valid existing rights, no surface coal mining operations except those which exist on August 3, 1977, shall be permitted—

(4) within one hundred feet of the outside right-of-way line of any public road, except [in circumstances not relevant to this challenge]

(5) within three hundred feet from any occupied dwelling, unless waived by the owner thereof, nor within three hundred feet of any public building, school, church, community, or institutional building, public park, or within one hundred feet of a cemetery.

The plaintiffs complain that the regulations at issue here do not clearly and explicitly prohibit surface impacts of underground mining within the specified protected areas in §§ 522(e)(4) and (e)(5). They claim that such protection is required by the broad definition of "surface coal mining operations" embodied in § 701(28)(A), 30 U.S.C. § 1291(28)(A), which specifically includes "surface impacts incident to an underground coal mine."

The government does not quarrel with the plaintiffs' construction of the definition of surface coal mining and suggests that the regulations track the language of the statute and notes that

The term "surface coal mining operations" is defined both in sections 701(28) of the Surface Mining Act and in 30 C.F.R. § 700.5 as including, subject to the requirements of section 516 of the Act, surface operations and surface impacts incident to underground coal mines. The prohibitions of sections 761.-11(d), (e), (f) and (g) extend to surface operations and surface impacts incident to underground coal mining.

Sec.Res. at 79.

In their reply brief the plaintiffs citizen and environmental groups express their suspicion that the Secretary does not mean to bar those surface effects which do not cause damage and thus does not intend to bar *all* surface effects.

The court will summarily affirm the current regulations which track the statutory language while noting that the Secretary has committed himself to a new rulemaking with respect to the impact of §§ 522(e)(4), (e)(5), 30 U.S.C. §§ 1272(e)(4), (e)(5), on underground mining. *See* 50 Fed. Reg. 13250 (April 3, 1985).

First, this court's review of the Secretary's action in adopting national regulations should be confined to the issues in the record made before the Secretary. It is literally true that this issue was raised for the first time in citizen plaintiffs' reply brief in this action and then pursued at oral argument. As this court noted in its VER opinion,

To have this court decide whether the rule is arbitrary and capricious would mean that this court would be the first forum in which the competing arguments are publicly weighed. The APA requires that the public have an opportunity to make its arguments to the agency, and for the agency to respond to the major concerns in promulgating a final rule.

VER Opinion at 15. Further, citizen plaintiffs are not challenging a regulation but an interpretation of a regulation—one not shown to exist anywhere in the record. In their supplemental brief on this issue citizen plaintiffs declare:

Despite the facial clarity of the rules, OSM had changed its interpretation of the regulations. Citizen plaintiffs were informed by OSM officials that the new rules did *not* bar all surface impacts, including all subsidence impacts, within the 522(e) buffer zones. It was the change that brought about Citizen Plaintiffs' present challenge to the buffer zone rules.

Citizen Plaintiffs' Supp.Mem. at 6 (emphasis in original). They further rely on the statements made by counsel at oral argument purportedly reaffirming this interpretation. But those statements, even if construed to reaffirm the allegedly illegal interpretation, were made on the day after

the Secretary proposed to examine the issue.

Citizen plaintiffs are left with a very real concern that the Secretary may, in fact, choose to apply the regulation in a manner they deem illegal pending the outcome of a new rulemaking. Nothing the court does today, however, acts as a bar to judicial relief when and if such allegedly illegal application takes place.

G. Protecting Only Those Places Actually Listed in the National Register and Not Places Eligible to be Listed

 Plaintiff citizen and environmental groups further challenge § 761.11(c) (1984), 48 Fed.Reg. 41349 (1983) on grounds that it offers protection only to places actually listed in the National Register of Historic Places, rather than extending protection to places eligible for listing in the National Register. The Act speaks simply of protection for places "included in the National Register." § 522(e)(3), 30 U.S.C. § 1272(e)(3). First, plaintiffs argue that had Congress wanted to limit protection only to those places *listed* in the National Register, the draftsmen would have used this more narrow term. Plaintiffs rely heavily on the fact that places *eligible* for inclusion in the National Register are given the same protection from undertakings by federal agencies under the NHPA as places listed in the National Register. 16 U.S.C. § 470 *et seq.* Because places not formally listed might be most prone to quick destruction by mining, they argue, it would be logical for Congress to have intended protection for these areas.

The government first draws the court's attention to the fact that in its February 1980 opinion the court noted that the government conceded the very issue argued here and there agreed to withdraw the regulation insofar as it attempted to protect places eligible for listing on the National Register. Feb. 1980 opinion at 23. In addition, the government argues essentially that while it is true that under the National Historic Preservation Act places that are listed as eligible for inclusion in the National Register are given the same protection from undertakings by federal agencies as are those that are actually listed, that does not mandate a conclusion that *SMCRA* requires that places that are eligible qualify for the protection afforded in § 522(e)(3), 30 U.S.C. § 1272(e)(3). Further, the government points to the fact that the Secretary's responsibility under the NHPA are carried out via other regulations that, for example, require that permit issuance be coordinated with the NHPA. 30 C.F.R. § 773.12 (1984). Finally, the Secretary points out that plaintiffs have not been able to point to anything in the legislative history to suggest such a broad reading of the phrase "included in the National Register." The court is convinced by the reasoning of the government and rejects plaintiffs' challenge to this aspect of 30 C.F.R. § 761.11(c).

H. Protection of Only Publicly-Owned Places in the National Register

 Citizen and environmental groups next object to 30 C.F.R. § 761.11(c) (1984) which, subject to VER, prohibits mining on "any lands where mining will adversely affect any publicly owned park or any *publicly* owned places included in the National Register of Historic Places, unless approved jointly by the regulatory authority and the Federal, State, or local agency with jurisdiction over the park or place" (emphasis added).

Plaintiffs first claim that the regulation is not supported by the words of the statute which speak of mining "which will adversely affect any publicly owned park or places included in the National Register of Historic Sites...." Section 522(e)(3), 30 U.S.C. § 1272(e)(3). They claim that use of the disjunctive "or" precludes the conclusion that the word "publicly" modifies "places." Further, they argue that since the concepts of "publicly owned park" and "places included in the National Register" were added to the statute at separate times, it would be error to read them together. In addition they claim that there is no basis in the legislative history for distin-

guishing between privately owned and publicly owned places listed in the National Register. Finally, they argue that the reference in the Act to joint approval by the regulatory authority and the federal, state or local agency with jurisdiction over the park or site does not require a reading that the place be publicly owned since the concept of jurisdiction is distinct from, and broader than, the concept of ownership.

The government counters by arguing first that the issue was resolved earlier in this case by the Walter Heine affidavit of October 29, 1979 in which the department noted its agreement to withdraw that portion of 30 C.F.R. § 761.11(c) insofar as it "would apply to privately owned places listed on the National Register of Historic Places in addition to publicly owned places." 44 Fed.Reg. 67942 (1979). Industry argues that at least the Heine affidavit evidences a consistent interpretation by two successive Secretaries. The government further argues that the Secretary's interpretation is consistent with the protection provided privately owned places under the National Historic Preservation Act because a privately owned place may not be listed on the National Register over the owner's objection. Thus, it would be anomalous to prohibit mining that affected a privately owned place on the list where the private owner did not object. In addition, the government counters that the requirement of § 522(e)(3) that requires joint approval by OSM and the federal, state or local agency with jurisdiction over the historic site requires that some governmental entity has control over the site. Because privately owned sites would not be controlled by a public agency, the argument

continues, Congress could not have intended that they be the subject of protection under § 522(e)(3).[12]

The court concludes that the proper construction of the Act requires protection of publicly owned or privately owned places in the National Register. The court is influenced by several factors in coming to this conclusion. First, the court believes that in this context the use of the disjunctive "or" separates the modifier "publicly" from the term "places in the National Register." Cf. Flora v. United States, 362 U.S. 145, 148–50, 80 S.Ct. 630, 632–33, 4 L.Ed.2d 623 (1960). Industry rejects this argument stating that the word "and" here would be meaningless. The court agrees, but use of the word "and" was not the only way to avoid the disjunctive quality of "or." This result is further supported by the lack of parallelism between the nouns modified by the phrase "publicly owned." See id. (ordinary principles of English prose are relevant to a construction of congressional enactment). Third, citizen plaintiffs point out that the restriction relative to parks and the restriction relative to National Register sites were added to the statute at separate times. Thus, the phrase "publicly owned park or places" was not originally drafted as a unit. Compare S.Rep. No. 402, 93d Cong., 1st Sess. 69 (1973) with H.R.Rep. No. 1522, 93d Cong., 2d Sess. at 53 (1974). In addition, the court does not find persuasive the Secretary's argument that the term "jurisdiction" used in § 522(e)(3) necessarily implies ownership or control over the site. Simply because private landowners may decline registry under federal law does not mean that once having accept-

12. Industry argues first, that the court owes deference to the construction of the statute by the Secretary. See Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). The Supreme Court in Chevron did nothing to change the court's role as the "final authority on issues of statutory construction." 104 S.Ct. at 2782 n. 9. Rather, it noted that "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id.;

see also Montana v. Clark, 749 F.2d 740, 744–46 (D.C.Cir.1985).

Next, Industry argues that a modifier's affect continues until the next comma and cites to this court's July 1984 opinion in In Re: Permanent Surface Mining Regulation Litigation II (Round I). The court does not find that its opinion in Round I is dispositive of the issue at bar. There, a different grammatical construction was at issue, and the court relied, in addition to the placement of the comma, on treatment of the issue in the relevant Senate Report. See Round I Opinion at 19.

ed registry they must be able to consent to mining around their privately owned sites. Finally, the Secretary does not refute citizen plaintiffs' assertion that ninety to ninety-nine percent of places listed in the National Register are privately owned. The court is wary of embracing a construction that would have the practical effect of deleting the protections for the overwhelming majority of National Register listings from the statute. The court finds it odd that Congress would do so without any express discussion or without using a more precise construction to carry this out, if that had been its intent. Although none of the above factors are alone dispositive, the court concludes that Congress intended in § 522(e)(3) to protect privately owned and publicly owned places in the National Register.

I. Procedures for Joint Approval of Mining that Affects Parks and Historic Sites

■ Plaintiff citizen and environmental groups next challenge 30 C.F.R. § 761.12(f) (1984), 48 Fed.Reg. 41350 (1983). Section 522(e)(3) of SMCRA permits mining on areas that affect parks or places on the National Register if there is joint approval by both the regulatory agency and the agency with jurisdiction over the park or site. 30 C.F.R. § 761.12(f) provides that when the regulatory authority determines that a proposed coal mining operation will adversely affect a park or place included in the National Register, it will notify the federal, state or local agency with jurisdiction over that park or place. Plaintiffs object to that portion of this regulation which declares that the agency then "has 30 days from receipt of the request within which to respond and that failure to interpose a timely objection will constitute approval." *Id.* Plaintiffs argue that this procedure does not meet with the statutory requirement of joint approval and that the cases relied on in the preamble to the final rule do not support the imposition of such a rigid formula on the federal, state and local entities upon whom this deadline is imposed.

The court believes that the Act accords the Secretary the flexibility to determine by regulation how approval is to be indicated in such cases. As the Secretary points out, the time period runs from the granting of actual notice to the agency with jurisdiction over the park or National Register site and includes an extension provision. Citizen plaintiffs argue that such an approval mechanism is only permissible where Congress expressly provides for it. The court does not read the Secretary's powers under the Act so narrowly, or infer any congressional intent to negate such an approval process.

J. The Revised Definition of "Significant Recreational Timber, Economic or Other Values Incompatible with Surface Coal Mining Operations"

■ Plaintiff citizen and environmental groups next challenge the definition of "significant recreational, timber, economic or other values incompatible with surface coal mining operations" embodied in 30 C.F.R. § 761.5 (1984), 48 Fed.Reg. 41348 (1983) as arbitrary and capricious and inconsistent with law.

Section 522(e)(2), 30 U.S.C. § 1272(e)(2) bars surface coal mining on national forest lands unless the Secretary finds, among other things, that "there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations." *Id.* The Secretary's original rule defined the phrase in part to mean "those significant values which could be damaged by ... surface coal mining operations." 30 C.F.R. § 761.5 (1980). The new rule includes "those values to be evaluated for their significance which could be damaged beyond an operator's ability to repair or restore." 30 C.F.R. § 761.5 (1984). Plaintiffs claim that this rule will permit mining in national forests as long as reclamation is possible. They claim that the legislative history does not support such a rule because Congress sought to restore balance in federal land use decisions whereas mining had traditionally been accorded primary consideration as

a land use. S.Rep. No. 128, 95th Cong., 1st Sess. 55 (1977). Further, they claim that to permit a determination based on reclamation renders § 522(e)(2) superfluous:

> The unsuitability criterion in Section 522(a)(2) already *requires* that lands be designated as unsuitable where reclamation in accordance with SMCRA is not technologically and economically feasible. There would be virtually no utility in Section 522(e)(2) if Congress intended the phrase "significant recreational, timber, economic or other values" to be defined as a matter of reclamation.

Citizen Plaintiffs' Mem. at 35.

The Secretary responds that the definition as promulgated reflects Congress' recognition that the national forests have multiple land uses among which is the mining of valuable mineral resources. The Secretary argues that surface mining in the national forests is a temporary disruption which is consistent with the Act. Further, the Secretary rebuts the claim that the Secretary's rule simply reiterates the reclamation requirement already in § 522(a)(2) by noting that section 522(a)(2) would not require the consideration of values such as scenic, historic and cultural interests which must be considered pursuant to 30 C.F.R. § 761.5 in determining compatibility of surface mining in national forests.

The court finds the Secretary's definition inconsistent with law. The language of the Secretary's definition clearly focuses on whether, for example, the recreational or timber value could be damaged beyond an operator's ability to repair or restore without considering in the first instance whether the surface mining is incompatible with the values listed—even if reclamation is possible. The court is persuaded by the legislative history which indicates that Congress sought to prohibit more than surface mining in national forests only where reclamation is not possible.

> [T]he Committee has made a judgment that certain lands simply should not be subject to new surface coal mining operations. These include primarily and most emphatically those lands which cannot be reclaimed under the standards of this Act *and* the following areas dedicated by the Congress in trust for the recreation and enjoyment of the American people: lands within the ... National Forests with certain exceptions.

S.Rep. No. 128, 95th Cong., 1st Sess. 55 (1977) (emphasis added); *see also* H.R.Rep. No. 218, 95th Cong., 1st Sess. 95 (1977). The court further finds it persuasive that evaluating the values in question solely in terms of reclamation has the effect of rendering § 522(e)(2) superfluous. Such a construction of a statute is to be avoided. *See In Re: Permanent Surface Mining Regulation Litigation*, 627 F.2d 1346, 1362 (D.C.Cir.1980).

The statute does not prohibit all surface coal mining in national forests, but rather permits it when, among other things, the "Secretary finds that there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations...." § 522(e)(2), 30 U.S.C. § 1272(e)(2). The court merely holds that a rule, such as the one promulgated which evaluates those values solely in terms of reclamation, is inconsistent with the Act. This definition in § 761.5 must be remanded to the Secretary.

**K. The Definition of Cemeteries in § 761.5**

Plaintiffs citizen and environmental groups next challenge the Secretary's definition of "cemeteries" in 30 C.F.R. § 761.5 (1984), 48 Fed.Reg. 41348 (1983), as arbitrary and capricious and inconsistent with law. Section 522(e)(5) of the Act prohibits mining "within one hundred feet of a cemetery." Whereas the former regulations defined a cemetery as "any area of land where human bodies are interred," 30 C.F.R. § 761.5 (1980), the new definition declares a cemetery to be "any area of land where human bodies are interred, except for private family burial grounds." 30 C.F.R. § 761.5 (1984).

Plaintiffs begin by pointing out that the Act uses the word "cemetery" and that

nothing in the legislative history suggests that Congress meant anything other than the common meaning of the word. Plaintiff citizen and environmental groups point to testimony at a congressional hearing where disturbance of family private cemeteries was graphically reported. *See Surface Mining Hearings Before the Subcomm. on Minerals, Materials, and Fuels of the Senate Comm. on Interior and Insular Affairs*, 92d Cong., 1st Sess. 225 (1971). Further, plaintiffs point to a decision by the Interior Board of Surface Mining and Reclamation Appeals wherein the Board held that the term "cemetery" as used in section 522(e)(5) "may fairly be said to embrace a private burial ground." *Marietta Coal Co.*, 2 IBSMA 382, 87 I.D. 589, 591 (1980).

Finally, in an attempt to demonstrate the potential harm occasioned by such a definition, the state of Kentucky noted that "In Kentucky, burial in a family grave is customary. The proposed change would affect hundreds of private cemetery sites and in essence discriminates against the customs of many Kentucky people." Ad.Rec. 10761.

The government counters that the definition was written in response to the type of situation that arose in *Holmes Limestone Co. v. Andrus*, 655 F.2d 732 (6th Cir.1981), *cert. denied*, 456 U.S. 995, 102 S.Ct. 2280, 72 L.Ed.2d 1292 (1982), in which the owners of a private burial plot wanted to permit mining closer to the plot than the regulations would provide. *Id.* at 736. Further, the Secretary argues that the term "cemetery" in the act should be narrowly construed because there are no waivers or exceptions built into the Act for the exclusion of cemeteries as there are for other areas designated unsuitable for surface mining, such as national forests, § 522(e)(2), 30 U.S.C. § 1272(e)(2); places in the National Register of Historic Sites, § 522(e)(3), 30 U.S.C. § 1272(e)(3); public roads, § 522(e)(4), 30 U.S.C. § 1272(e)(4); and private dwellings, § 522(e)(5), 30 U.S.C. § 1272(e)(5). In addition, the government argues that the Secretary has added specific safeguards in the permitting process that have the effect of protecting private burial grounds. For example, under the rules each permit applicant must identify all private family burial grounds in or within 100 feet of the proposed permit area. 30 C.F.R. § 779.24j (1984). The rules also provide that before issuing a permit the regulatory authority must find that mining activities would not adversely affect private family burial grounds and if it would, the burial ground may be relocated if allowed by state law. If the burial ground cannot be so moved, no mining which would adversely affect it will be permitted. 30 C.F.R. § 773.15(c)(11).

The court concludes that the definition promulgated by the Secretary is inconsistent with law. First, the plain meaning of the word cemetery admits of no distinction between public and private burial places. Nor does the court find persuasive the Secretary's argument that the term should be "narrowly construed" because Congress chose to make no provisions for exceptions or waivers from it. Such a failure to make exceptions is as much evidence that Congress wanted no exceptions or waivers from the restriction. Further, although the Secretary claims to have found another way to protect private burial grounds, the method must fall because it is contradicted by the direct congressional command embodied in § 522(e)(5), 30 U.S.C. § 1272(e)(5). Finally, the court finds persuasive plaintiffs' argument that the Secretary's rule, if meant to protect those owners of cemeteries who consent to the mining, is poorly suited to carry out that intent since it excludes the protection for *all* private burial grounds; thus the court finds alternatively that the definition of cemetery is arbitrary and capricious. The definition of cemetery included in 30 C.F.R. § 761.5 must be remanded to the Secretary.

### L. Wild and Scenic Study Rivers

Plaintiff citizen and environmental organizations challenge 30 C.F.R. § 761.11(a) (1984), 48 Fed.Reg. 41349 (1983), as unlawfully limiting the area protected within the Wild and Scenic Rivers System. In that

rule, the Secretary restricts the area protected for Wild and Scenic Rivers to "a corridor extending not more than one-quarter mile from each bank for the length of the segment being studied." *Id.*

Plaintiffs argue that in regulations promulgated under the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.*, the Secretaries of Interior and Agriculture defined the area to be included in study rivers as the "portion of a river authorized by Congress for study and its immediate environment comprising an area extending *at least* one-quarter mile from each bank" (emphasis added). 47 Fed.Reg. 39456 (1982). Plaintiffs argue that by setting a maximum distance from the river past which protection will not be afforded, the new rule impermissibly permits mining in portions of land corridors which are part of study rivers when these portions are more than one-quarter mile from the river. In its cross-motion the Secretary declared that it "agrees that the administrative guidelines [under the Wild and Scenic Rivers Act] should govern and will propose to amend 30 C.F.R. § 761.11(a) to establish the boundary for study rivers under the Surface Mining Act to be the same as those established for each river under the administrative guidelines to the Wild and Scenic River Act." Sec.Res. at 43 n. 27. Accordingly, this court will remand this regulation to the Secretary for further action consistent with the Secretary's concession.

## IV. Revegetation

### A. Introduced Species

■ Plaintiff citizen and environmental groups next challenge the Secretary's regulations with respect to "introduced species" complaining that they elevate introduced species to a level equal with native species, and are arbitrary, capricious and inconsistent with law. Section 515(b)(19), 30 U.S.C. § 1265(b)(19), requires that a mine operator:

establish on the regraded areas, and all other lands affected, a diverse, effective, and permanent vegetative cover of the same seasonal variety native to the area of land to be affected and capable of self-regeneration and plant succession at least equal in extent of cover to the natural vegetation of the area; except, that introduced species may be used in the revegetation process where desirable and necessary to achieve the approved postmining land use plan.

The old regulations provided four conditions which had to be met before the regulatory authority could approve the use of introduced species. 30 C.F.R. § 816.112 (1980), 44 Fed.Reg. 15413 (1979). The current regulations maintain two of those requirements—that the species be compatible with the plant and animal species of the area, and that the species meet the requirement of Federal and state laws relative to seed, poisonous and noxious plants, and introduced species, 30 C.F.R. § 816.111 (1984), 48 Fed.Reg. 4016 (1983).[13]

Plaintiffs complain that the Secretary deleted the four findings needed to approve the use of introduced species because he believed that the existing rules discouraged or strictly limited the use of introduced species whereas the Act permitted their use when desirable and necessary to achieve the postmining land use. 47 Fed. Reg. 12598 (1982). The court cannot say that this interpretation is inconsistent with the words of the Act—especially since the Secretary has retained certain requirements in addition to the regulatory authorities' finding that the introduced species be desirable and necessary and thus he has not merely reproduced the statutory language.

In their reply plaintiffs argue that the Secretary has failed to "flesh out" the statute, as this court has required in earlier opinions. Yet the former § 816.112 cited with approval by the plaintiffs apparently left discretion as to what constituted neces-

---

**13.** The new regulation is slightly more permissive with respect to poisonous and noxious plants.

sary and desirable. That regulation expressly required that the regulatory authority have determined "after appropriate field trials have demonstrated that the introduced species are desirable and necessary to achieve the approved postmining land use."

Plaintiffs also object to the elimination of the requirement that "field trials" be required to demonstrate that introduced species are desirable and necessary. The court will uphold the new regulation unless it determines that the Secretary's decision is arbitrary and capricious or unsupported by the record. In the preamble to the proposed rule the Secretary explained that:

OSM believes that in most cases the respective regulatory authorities would be aware of research findings and characteristics of species that are desirable for use in a revegetation plan and may approve such species without the necessity of field trials. Hence, the requirement for field trials is proposed for deletion.

47 Fed.Reg. 12598 (1982). The Secretary went on to note that the regulatory authority was still free to require field trials where the operator proposes to use a species that has not been proven suitable for the approved postmining land use under similar growing conditions. *Id.* Plaintiffs contend that the deletion of the field trial requirement is not supported by the record because the Secretary erroneously believed that the old rule required field trials in all instances. Plaintiffs claim that the old

rules did not so require, but rather that rule read the requirement of field trials broadly so as to include "successful experience with species in the mined area." 44 Fed.Reg. 15233 (1979). It would appear then that field trials *per se* were not required under the old rules, and that the Secretary has merely restated the requirement for determining which species may be acceptable for use in a revegetation plan while deemphasizing field trials. It is difficult to see any significant departure from the old rule which the citizen plaintiffs claim to have preferred.[14] The court concludes that the Secretary's regulations with respect to introduced species are to be upheld.

**B. Failure to Establish Minimum Productivity Standards**

As pointed out above § 515(b)(19), 30 U.S.C. § 1265(b)(19), requires operators to "establish on the regraded areas, and all other lands affected, a diverse, *effective,* and permanent vegetative cover ... *capable of self-regeneration and plant succession at least equal in extent of cover to the natural vegetation of the area.*" (emphasis added).

The previous regulations established detailed standards for determining revegetation success based on both ground cover and productivity. *See* 30 C.F.R. § 816.116 (1980). The new regulations, citizen plaintiffs contend, delete all requirements that

---

**14.** In the preamble to the final rules the Secretary pointed out:

Field trails [sic] are generally appropriate before unproven species can be used for surface mine reclamation. Other species that have been previously demonstrated, under similar biotic conditions, to be successful in achieving the specified postmining use generally do not require additional tests. Publications by Vogel (1981) and Thornburg (1982) are examples of documents that can be used by regulatory authorities to identify native and introduced species that have been successfully used to revegetate mined lands. In addition, unproven species could be tested for suitability under the experimental practices rule if the requirements of § 785.13 are satisfied.

48 Fed.Reg. 40144 (1983). The preamble to the rules requiring field trials explained:

As stated in the preamble of the proposed regulations (43 Fed.Reg. 41775, Sept. 18, 1978), the requirement for appropriate field trials should be interpreted broadly to include successful experience with species in the mined area or a similar area. Naturalized species that have been in common usage, such as the tree species in the Great Plains, will generally have been demonstrated to be acceptable. However, the operator and the regulatory authority must be mindful of the geographic adaptation of each species, since species became established only under conditions similar to those under which they evolved (Sampson, 1952, p. 266), and of the many plant species, both introduced and native, which have been used to improve and stablize the soil (Sampson, 1952, p. 299).

44 Fed.Reg. 15233 (1979).

success be measured in terms of productivity, and thus challenge 30 C.F.R. §§ 816.116 and 817.116, 48 Fed.Reg. 40160–62 (1983). Plaintiffs rely on legislative history that they contend explicitly calls for productivity standards. *See, e.g.,* H.R.Rep. No. 218, 95th Cong., 1st Sess. 106 (1977).

The Secretary agrees that productivity is to be a criterion and it is so included in §§ 816.116(b)(1) and (b)(2). Industry further points out that when productivity requirements are not present, they were not present under the old regulations. *Compare* 30 C.F.R. §§ 816.116(b)(3), (4), (5) (1984) *with* 30 C.F.R. §§ 816.116(b)(3)(i), (ii), (iv) (1979). Plaintiffs focus on the following language of § 816.116(a)(2):

> Standards for success shall include criteria representative of unmined lands in the area being reclaimed to evaluate the appropriate vegetation parameters of ground cover, production *or* stocking. (emphasis added).

Plaintiffs argue that this rule gives the regulatory authority the choice to ignore productivity as a measure of success. The court disagrees that the regulatory authority has any such option. The wording of (a)(2) is necessary because it is a general section that is to be qualified more specifically in subsection (b) where production is specifically called for in relation to grazing land, or pasture land (b)(1) and cropland (b)(2). Section (b)(3), on the other hand, calls for success to be measured on the basis of stocking and ground cover.

Plaintiffs read §§ 816.116(b)(2) and (b)(3) as requiring a productivity standard or "such other success standards approved by the regulatory authority." The relevant language in (b)(1), for example, reads:

> For areas developed for use as grazing land or pasture land, the ground cover and production of living plants on the revegetated area shall be at least equal to that of a reference area *or* such other success standards approved by the regulatory authority.

816.116(b)(1) (emphasis added).

The court and apparently the Secretary read the rules as always requiring a pro-duction standard; but that the production standard is to be measured *either* with respect to a reference area *or* to such other success standards approved by the regulatory authority. In any event, the Secretary in his supplemental briefing stated flatly: "On its face, 30 C.F.R. 816.116(b)(1) clearly specifies that the revegetation success of grazing land and pasture land shall be measured in terms of productivity." Sec.Supp. Res. at 10. Given that (b)(2) contains the same language, the same must be true of it. The court agrees with the Secretary and Industry's reading of the final regulation that productivity must be measured in those instances where they were measured under the old rule. Thus, the parties are in essential agreement and plaintiffs' challenge is rejected.

### C. Requirement for Crop Production to Measure Reclamation Success where Postmining Land Use is Cropland

The language of § 816.116(b)(2) leads to the same misunderstanding as is illustrated above with respect to the overall productivity standard. This regulation requires that:

> For areas developed for use as cropland, crop production on the revegetated area at least equal to that of a reference area or such other success standards approved by the regulatory authority.

Plaintiffs believe that the phrase "such other success standards approved by the regulatory" authority might permit success to be measured by a means other than the actual production of crops. As noted above, the court does not so read the regulation, and neither does the Secretary. "The rule allows 'states [. . .] to determine which crop or group of crops need to be grown to satisfy the productivity requirement' but does not allow a standard other than crop production." Sec.Res. at 102 (quoting 48 Fed.Reg. 40152 (1983)). Thus there is no disagreement on what is called for. In light of the similar language in the old 30 C.F.R. § 816.116(b)(3)(iii), the court does not find the regulation so unclear as to require a remand. Of course, to avoid

any similar confusion in the future, the Secretary may, in his discretion, issue a clarification consistent with his clarification mentioned above.

D. Use of Augmentative Practices

 Section 515(b)(20), 30 U.S.C. § 1265(b)(20), of the Act requires the operator to:

> assume the responsibility for successful revegetation ... for a period of five full years after the last year of augmented seeding, fertilizing, irrigation, or other work in order to assure compliance with paragraph (19) above [concerning vegetative cover], except in those areas or regions of the country where the annual average precipitation is twenty-six inches or less, then the operator's assumption of responsibility and liability will extend for a period of ten full years....

Plaintiff citizen and environmental groups complain that the Secretary's revised rules at 30 C.F.R. § 816.116(c)(4), 816.116(b)(3)(ii) (1984) and their counterparts in § 817, 48 Fed.Reg. 40160–62 (1983), run counter to this requirement in that they allow the repair of rills and gullies without restarting the revegetation responsibility period; and (2) they allow the replanting of trees during the period of responsibility.

1. *Repair of Rills and Gullies*

In the preamble to the final rules the Secretary explained that

> [U]nder final § 816.116(c)(4), the repair of rills and gullies including reseeding or transplanting, can occur without extending the period of responsibility for revegetation success only if it is a normal conservation practice in the region, and such actions can be expected to continue as part of the postmining land use or if discontinuance will not reduce the probability of permanent revegetation success.

48 Fed.Reg. 40157 (1983). Plaintiffs complain, however, that repair of rills and gullies is not a normal conservation practice and point to comments of the Commonwealth of Virginia to support their case.

Citizen Plaintiffs' Mem. at 165–66 (citing Ad.Rec. at 8357). The Secretary and Industry respond that the above rule simply recognizes that the repair of rills and gullies is not always augmentative, and that the rule merely allows the regulatory authority to make that determination under the conditions quoted above. Further, the Secretary argues that by allowing the repair of rills and gullies, without creating fear that the time period recommence, the Secretary's interpretation of the rule will encourage the use of husbandry practices. The court cannot say that the Secretary's stance is unreasonable. But as plaintiff citizen and environmental groups point out in their reply, the Secretary has cited no support in the record for the proposition that the repair of rills and gullies is a normal conservation practice in any region of the country. In its supplemental briefing filed pursuant to this court's order of April 9, 1985, the Secretary pointed to record evidence that normal husbandry practices should be permitted but to no record evidence that the repair of rills and gullies is ever a normal conservation practice. Thus, the rule must be remanded as lacking adequate support on the record.

2. *Replanting of Trees*

Revised 30 C.F.R. § 816.116(b)(3)(ii) provides:

> Trees and shrubs that will be used in determining the success of stocking and the adequacy of plant arrangement shall have utility for the approved postmining land use. At the time of bond release, such trees and shrubs shall be healthy, and at leat [sic] 80 percent shall have been in place for a [sic] least three growing seasons in areas with a 5-year period of responsibility and at least eight growing seasons in areas with a 10-year period of responsibility. No trees and shrubs in place for less than two growing seasons shall be counted in determining stocking adequacy.

The Secretary believed that this is a reasonable compromise that will allow normal replanting if approved as a husbandry practice under 816.116(c)(4). *See* 48 Fed.Reg.

40153 (1983). The Secretary contends that NWF has no basis to object to this regulation because it was adopted at its urging, *see* Ad.Rec. at 8256–57, with the exception that the Secretary reduced from four to three the number of seasons that eighty percent of the plants had to be in place, and doubled the number, to eight seasons, for areas with a ten-year responsibility period. The environmentalists respond that this is true, but "only on the condition that the state agencies responsible for the administration of forestry and wildlife programs be given approval authority over such decisions." Citizen Plaintiffs' Reply at 117. They complain that without such approval—the final rule merely provides for consultation, 816.116(b)(3)(i)—"the rules do not sufficiently assure that the planting of trees during the period of responsibility is a normal husbandry practice rather than an augmentative practice prohibited by section 515(b)(20) of the Act." Citizen Plaintiffs' Reply at 117–118. Because there is no support in the record for the Secretary's view that replanting is a normal husbandry practice, the court will remand this regulation because without such a determination, the court cannot satisfy itself that the Secretary's requests will not prohibit augmentative practices. The Secretary has a responsibility to see to it ·that augmentative practices restart the running of the responsibility period. Thus, a delegation to the states of whether tree replanting is an augmentative or husbandry practice is an abdication of this responsibility. At least when the Secretary decides to give flexibility with respect to specific kinds of practices, there should be some support in the record for the fact that the practice in question *may*, in some instances, be a normal conservation measure. The Secretary has cited no support with respect to rills and gullies or replanting. 30 C.F.R. §§ 816.-116(c)(4), 816.116(b)(3)(ii) are remanded to the Secretary.

E. Failure to Require Livestock Grazing to Demonstrate Reclamation Success

■ This court's February 1980 opinion struck down a requirement that operators demonstrate the productivity of reclaimed land for at least the last two years of liability by actually using the land for grazing. *See* February 1980 Opinion, *supra*, at 58–59. The court found that such a requirement was inconsistent with the language of the Act and its legislative history. *Id.* The court then pointed out that while grazing is permissible it is not mandated by the Act. The court did not, as plaintiff citizen and environmental groups contend, reject the grazing requirement because of the efficacy of soil surveys. Rather, as industry correctly points out, that opinion allowed that soil surveys could be used to demonstrate *cropland* productivity on prime farmland. *Id.* at 59. Citizen plaintiffs point to a study by the National Academy of Sciences which, they argue, should have led the Secretary to conclude that grazing is now necessary because soil surveys alone are inadequate to demonstrate success on grazing land. The court cannot say that the Secretary's failure to require grazing based on this study, in view of this court's prior holding, is arbitrary, capricious or inconsistent with law. In their reply citizen plaintiffs shift their focus slightly, stating that in the face of a study that questions the use of soil surveys, in order to retain the use of soil surveys as a sole means of determining productivity, the Secretary would need some contrary evidence in the record. The court agrees, but reads the rule at § 816.116(b)(1), 48 Fed. Reg. 40160 (1983), and the Secretary's comments as recognizing that the use of a soil survey alone is insufficient and adding that instead of requiring grazing, "[u]se of a reference area or other appropriate standard is also possible." 48 Fed.Reg. 40148 (1983).

F. Revegetation Success in Only One of Last Two Years

■ Sections 816.116(c)(2) and 817.-116(c)(2) (1984), 48 Fed.Reg. 40160–62 (1983), provide:

In areas of more than 26.0 inches average annual precipitation, the period of

responsibility shall continue for a period of not less than 5 full years. Vegetation parameters identified in paragraph (b) of this section shall equal or exceed the approved success standard during the growing season of the last year of the responsibility period or, if required by the regulatory authority, during the growing seasons of the last 2 years of the responsibility period.

Citizen plaintiffs complain that the regulatory authority cannot possibly determine whether self-generation and plant succession "at least equal in extent of cover to the natural vegetation of the area", *see* § 515(b)(19), has been achieved if success levels are met only for the last year.

The Secretary counters that the rule is an acceptable exercise of discretion in that the Act does not specify when, within the responsibility period, success is to be measured. "The Secretary concluded that in areas where the average rainfall exceeds 26 inches, States should be given an opportunity to determine whether a one or two year measurement period would best reflect local soil and climatic conditions." Sec.Res. at 112. *See* 48 Fed.Reg. 40156 (1983). Industry argues that "NWF's attempt to require that the operator demonstrate success in earlier years thus ignores Congress' express finding that the operator will often need the entire liability period to achieve revegetative success." Indus. Intervenors' Mem. at 28.

Citizen plaintiffs counter that the issue before the court is whether the rule assures that the vegetative success standard embodied in § 515(b)(19) ("a diverse, effective, and permanent vegetative cover....") will be met if the standards are met in only one season. They point out that the previous Secretary had concluded based on voluminous technical literature that "a two-year minimum time base is required to adequately assess the ability of a permanent vegetative cover to regenerate and sustain plant succession." 44 Fed.Reg. 15238–39, 15231–32 (1979). Thus, they argue, before the current Secretary could reach a conclusion that one year could suf-

fice, he had to point to some evidence in the record, or at least some reasoning, to support this conclusion.

The court agrees. The current proposal is similar to the Andrus rules, and sets out the literature on which it relies. *See* 47 Fed.Reg. 12601 (1982). But the Secretary has advanced no reasoning to support his view that a one-year attainment of success may suffice to determine whether the statutorily mandated revegetation goals set out in § 515(b)(19) are met. In the preamble to the proposed rules the Secretary declared that the change to permit a one-year period, unless the regulatory authority required two years, "is proposed to reduce the burden of recordkeeping and inspection." 47 Fed.Reg. 12600 (1982).

In his preamble to the final rule the Secretary declared:

Ample justification exists for requiring 2 consecutive years of proof of revegetation success in States with pronounced year-to-year variability in climatic conditions and where success is based on crop yields or other parameters that are highly sensitive to such conditions. The decision to require 1 or 2 year's [sic] proof of performance should rest with the regulatory authorities in those States where the annual average precipitation exceeds 26 inches.

48 Fed.Reg. 40156 (1983). Before the Secretary can permit states to use a one-year period, there must be some showing by the Secretary that use of the one-year period would suffice to meet the statutory mandate that the operator establish "a diverse, effective, and permanent vegetative cover" as required by § 515(b)(19). The court agrees with citizen plaintiffs that the Secretary has not adequately provided a basis for permitting a one-year period and thus §§ 816.116(c)(2) and 817.116(c)(2) must be remanded.

Citizen plaintiffs also objected to the requirement in § 816.116(c)(3) and § 817.-116(c)(3) that in areas with less than 26 inches of rainfall the success of revegetation be determined with regard to the last two years of the responsibility period.

This requirement was the same under the old rules. *See* 30 C.F.R. § 816.116(b)(1)(ii) (1980), 44 Fed.Reg. 15413 (1979). Further, citizen plaintiffs' comments quoted in their memorandum were not made in the context of an objection to the two-year proof of success requirement which was retained for areas of less than 26 inches annual rainfall, but rather appear to the court to focus on delaying the period to begin running the responsibility period. *See* Ad.Rec. at 8259–62. This approach was expressly rejected by this court in 1980. *See* Feb. 1980 Opinion, *supra*, at 60. Citizen plaintiffs' challenge to § 816.116(c)(3) and § 817.116(c)(3) is rejected.

### G. Secretary's Ground Cover Standards for Measuring Revegetation Success

 Plaintiff citizen and environmental groups complain that the new revegetation rules at 30 C.F.R. §§ 816.116(a)(2) and (b)(2) (1984), 48 Fed.Reg. 40160 (1983), are inconsistent with the law. They complain first that they permit a finding that ground cover "shall be considered equal to the approved success standard when they are not less than 90% of the success standard" with a 90% statistical confidence interval. 30 C.F.R. § 816.116(a)(2) (1984). Second, they complain that permitting comparison to a reference area *or* "such other success standards approved by the regulatory authority," §§ 816.116(b)(1), (2), results in a "standardless standard."

The court rejects plaintiffs' challenge of the ninety percent requirement embodied in § 816.116(a)(2). The Secretary points out that this requirement was embodied in the old rules and its need adequately explained. *See* 44 Fed.Reg. 15238 (1979). The court does not find that use of the word "equal" in the statute was meant to tie the Secretary to any precise statistical formula.

Plaintiffs' second challenge is more complicated. Under the old rule, the standards chosen by a state had to be either based on selection of a reference area or a standard developed using guidance procedures *published* by either USDA or USDI. 30 C.F.R. § 816.116(a) (1980). In discussing the new rule, the Secretary points out that section 816.116(a)(2) requires state success standards to include criteria representative of unmined lands in the area being mined. Further, as industry points out, the Secretary required that the criteria selected be representative of unmined lands in order to "prevent potential disparity between the use of reference areas and the use of other standards as the measure of success." 48 Fed.Reg. 40151 (1983). Industry further points out that the regulation recognizes a need for flexibility depending on varying conditions, and for flexibility in choosing success standards "when these standards are appropriate and approved as part of the regulatory program." 48 Fed.Reg. 40149 (1983). Because these standards must be approved by OSM, it is difficult for the court to conclude that OSM is abdicating its responsibility by not requiring reliance on federally published guides. Citizen plaintiffs have not convinced the court that the rule as promulgated does not carry out the Secretary's duty under the Act.

## V. Siltation Structures

### A. Siltation Structures Requirement

 Industry plaintiffs object to the requirement embodied in §§ 816.46(b)(2) and 817.46(b)(2), 48 Fed.Reg. 44051–52, that all surface drainage be passed through a siltation structure, as the best technology currently available ("BTCA"), before leaving the permit area. As the Secretary explains in his memorandum:

> The rules define "siltation structure" as "a sedimentation pond, a series of sedimentation ponds, or other treatement facility." 30 C.F.R. § 816.46(a)(1) (1983). Thus, siltation structures are not limited to sedimentation ponds alone, but also include other treatment facilities. The term "other treatment facility" is defined by 30 C.F.R. § 816.46(a)(3) (1983) as "any chemical treatment, such as flocculation, or mechanical structures, such as clarifiers, *that have a point-source discharge* and that are utilized to prevent additional contribution of suspended solids to stre-

amflow or runoff outside the permit area.

Sec.Res. at 119–20 (emphasis added). Industry alleges that the hydrologic balance siltation structure rules at 30 C.F.R. §§ 816.46 and 817.46 (1984) violate SMCRA in that the requirement is inconsistent with the Act, and the APA, in that technical data which indicates the danger of siltation structures in certain parts of the country was inadequately addressed by the Secretary.[15]

Section 515(b)(10), 30 U.S.C. § 1265(b)(10), of the Act requires surface mining operations to be conducted so as to "minimize the disturbances to the prevailing hydrologic balance ... both during and after surface coal mining operations and during reclamation...." The regulations relating to siltation structures were promulgated under the authority of § 515(b)(10)(B)(i) and (B)(ii) which provide that disturbances to hydrologic balance be minimized, *inter alia*, by:

> (B)(i) conducting surface coal mining operations so as to prevent, to the extent possible using the best technology currently available, additional contributions of suspended solids to streamflow, or runoff outside the permit area, but in no event shall contributions be in excess of requirements set by applicable State or Federal law;
>
> (ii) constructing any siltation structures pursuant to paragraph (B)(i) of this subsection prior to commencement of surface coal mining operations, such structures to be certified by a qualified registered engineer to be constructed as designed and as approved in the reclamation plan.

Industry plaintiffs point to a study in the record by Morris and Doehring which was done after the 1979 rules were promulgated in which the authors found that the use of siltation structures can "cause severe long- and short-term adverse effects

on the hydrologic balance." Indus.Mem. at 32.

> The authors explain that in certain circumstances sedimentation ponds can, in the short term, narrow or destroy stream channels, reduce channel capacity, and create intense localized erosion. In the long term they can cause major erosion and flooding that inundates low-lying areas.

*Id.* Industry argues simply that the siltation structure method cannot be BTCA if it actually causes harm and cannot be consistent with the mandate that damage to the hydrologic balance be minimized. For example, Industry argues that channel deepening and enlargement, two effects pointed to by the Morris and Doehring study, were expressly singled out by Congress in § 515(b)(10)(E) to be especially avoided. It further argues that where siltation structures remove more than just *additional* sediment contributions, their use is unauthorized under § 515(b)(10)(B)(i) of the Act. The methods approved by the Secretary in some cases, it argues, reduce sediment concentrations below the natural background level and are thus not BTCA. Given the fact that technologies are available which remove only the *additional* sediment contributions, it argues, the Secretary's method cannot be BTCA and is in contravention of the Act.

The court finds that the Industry arguments summarized above are heavily intertwined with their objections based on violation of the APA because, before it could decide that the regulations violate the Act, the court would have to make a technical determination that siltation structures are not BTCA in the West, and that they are harmful. These technical determinations, however, are for the Secretary and the court will not substitute its own judgment for that of the Secretary. The proper review of the Secretary's determination comes under the APA which mandates that the Secretary address concerns raised dur-

---

**15.** Because the court remands the rule due to inadequate explanation in the preamble, it need not consider whether the rule impermissibly violates state law, or whether BTCA must be determined on a mine by mine basis.

ing the comment period, and "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)).

Industry complains that the Secretary did not adequately consider information that siltation structures were not BTCA in all circumstances, and that in some cases they could actually harm the environment. Second, it claims that the Secretary supported his siltation structure requirement by stating that there was a "lack of a technical basis on which to judge the effectiveness of alternative measures." 48 Fed. Reg. 44036 (1983). Industry complains that this statement is not supported by the record.

The Secretary argues that the alternative measures suggested by the surfaceminers "are diffuse techniques which are not susceptible to the accurate monitoring or precise regulation which siltation structures provide." Sec.Res. at 122. But this explanation is not found in the preamble, and thus represents *post hoc* explanations of counsel which cannot be considered by the court. In addition, the Secretary argues that the types of concerns raised by the Morris and Doehring report are discussed in both the preamble to the current rule and the preamble to the previous rule, which also required siltation structures. 48 Fed.Reg. 44036 (1983); 44 Fed.Reg. 15160 (1979). Further, the Secretary argues that "A major factor in the Secretary's determination that siltation structures are BTCA is the requirement that the Secretary defer to EPA in the regulation of hydrologic impacts." Sec.Res. at 120. Section 702(a)(3) requires that the Secretary defer to EPA in matters governed by the

Federal Water Pollution Control Act ("FWPCA"), as amended, 33 U.S.C. §§ 1251–1376 (1982). Thus, the Secretary has adopted the EPA effluent limitations to regulate discharges of water from areas disturbed by surface mining activities. These limitations are, in turn, based on EPA data developed from the use of sedimentation ponds, and they are technology based and not water-quality based. The Secretary concludes "[c]onsistent with the technological basis for these EPA effluent limitations, the Secretary correctly determined that sedimentation ponds are BTCA." Sec.Res. at 121.

Industry argues that the Secretary is under no obligation to defer to the EPA in choosing how to protect the hydrologic balance at coal mines. It claims that although the FWPCA requires all point sources to comply with EPA effluent standards, and where they apply the Secretary of Interior cannot alter them, the FWPCA does not dictate which structures are to be used as sediment control measures under the Act.

The preamble to the final rule leaves little doubt that the deference to the EPA standards was a motivating factor:

> OSM is aware that the use of sedimentation ponds and other siltation structures in the West presents some problems. However, the effluent limitations promulgated by EPA are technology-based and not water-quality based.

48 Fed.Reg. 44036 (1983). This major reliance on EPA may be misplaced. Industry argues that the FWPCA "does not require siltation structures to be used and it does not require other sediment control measures that constitute point sources:...." Indus. Reply at 30. Rather, it contends, with support from the case law, that the FWPCA merely regulates effluent limits where point sources exist. *See In Re: Surface Mining Regulation Litigation*, 627 F.2d 1346, 1367 (D.C.Cir.1980); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 372–73 (10th Cir.1979).[16] At oral argu-

**16.** In *In Re Surface Mining Regulation Litigation*, 627 F.2d 1346 (D.C.Cir.1980), the court pointed out:

Congress certainly recognized in the Surface Mining Act that the EPA's existing regulatory authority under the Federal Water Pollution

ment counsel for the government never directly took issue with Industry's point that the FWPCA can not dictate the use of point sources. Instead, the Secretary's argument appears to be that use of a point source is necessary in order to "prevent, to the extent possible using the best technology currently available, additional contributions of suspended solids to streamflow, or runoff outside the permit area...." § 515(b)(10)(B)(i), 30 U.S.C. § 1265(b)(10)(B)(i). That may be so; but if it is so, the Secretary has an obligation to explain why that is so in a way that deals with the benefits and drawbacks of sedimentation ponds, and the competing alternatives. Despite the Secretary's contention in his memorandum that the preamble to the final rule "analyzes the pros and cons of alternate sediment control measures," and that "[t]he preamble carefully evaluates the potential effects of sedimentation ponds in the West," Sec.Res. at 122, the court disagrees.

The Secretary's only reference in the preamble to the final rule to alternatives came in a conclusory manner:

> The allowance for use of alternate sediment control measures is not adopted because there is not, at this time, a sufficient technical base for use of alternatives other than siltation structures, which OSM considers to be BTCA.

48 Fed.Reg. 44035 (1983); *see also id.* at 44036 (similar language). Similarly, the record evidence that pointed to potential negative impacts of siltation structures in the West was dismissed without reasoned analysis. OSM's recognition that "the use of sedimentation ponds and other siltation structures in the West presents some problems", 48 Fed.Reg. 44036 (1983), was not followed by any recognition of what those problems are and why, in the face of those problems, siltation ponds were still considered BTCA. Because the Secretary

does not enable this court to discern the path taken by him in responding to commenters' concerns, the court must remand 30 C.F.R. §§ 816.46(b)(2) and 817.46(b)(2).

## B. Stability and Testing Requirements for Small Ponds

 Industry challenges 30 C.F.R. §§ 816.49(a)(3) (1984), 48 Fed.Reg. 44004 (1983), and 816.49(a)(5)(i), 48 Fed.Reg. 44004 (1983), and their underground counterparts embodied in §§ 817.49(a)(3) and 817.49(a)(5)(i) (1984), 48 Fed.Reg. 44005 (1983), which require all impoundments—including small sedimentation ponds—to be constructed using a static safety factor of 1.5 and a seismic factor of 1.2 and that all impoundments be the subject of foundation investigations and laboratory testing.

Under the 1979 rules small sedimentation ponds were subject to fewer regulatory constraints than large sedimentation ponds. When the Secretary revised the permanent program regulations in 1983 so that the definition of impoundments was to include all sedimentation ponds, the result was that the revised regulations subjected small ponds to the same stability testing, computer modelings, investigations and analyses as large ponds.

The gist of the Industry complaint is that this requirement that small ponds now be subject to the same requirements as large ponds is nowhere explained in the record, and is thus arbitrary and capricious. Further, it argues that since there was no notice in the proposed rules of the change, the rule was not subject to proper notice and comment.

Industry argues that no commenter in the extensive administrative record suggested that the technical distinction between small and large sedimentation ponds should have been eliminated. Further, they argue that in certain respects the Secretary continues to recognize that the size

Control Act was deficient with respect to surface coal mining, in that EPA could not directly regulate discharges from abandoned and underground mines *or from nonpoint sources* (i.e., discharges not emanating from a discernible, confined, and discrete conveyance").

*Id.* at 1367; *see also United States v. Earth Sciences, Inc.,* 599 F.2d 368, 372 (10th Cir.1979) (mining may involve discharges from both point and nonpoint sources, and those from point sources are subject to regulation).

of an impoundment should dictate\ the amount of regulatory control because § 816.49(a)(1) requires large impoundments, but not small ones, to meet both the Secretary's performance standards *and* MSHA's construction standards.[17]

Industry also argues that the notice of the new rule was deficient in that the proposed impoundment rule made no mention of foundation testing or investigation requirements for *any* impoundments. It acknowledges that the proposed rule did require that all impoundments meet an "adequate" static safety factor, but they contend that such a requirement was not sufficient to put anyone on notice that a *specific* static safety factor would be adopted. It is the adoption of the specific static safety factor, Industry argues, that requires the extensive testing, because only through testing can an operator certify that the standard has been met. The requirement of an *adequate* static safety factor, on the other hand, would allow the safety criteria to be met by adopting a standard design for a small sedimentation pond. The proposed siltation structure rules, it points out, maintained the regulatory distinction between large and small ponds.

The Secretary argues that both the proposed rules relative to impoundments and sedimentation ponds included references to factors of safety. One purpose of the new rules, the Secretary argues, was to do away with the confusing static safety factor requirement of the previous rules. 48 Fed.Reg. 43998 (1983). Although the proposed rule spoke of an "adequate" static safety factor, "several commenters suggested that a specific safety factor be set for all ponds and one commenter suggested a factor of 1.5," Sec.Res. at 130, which the Secretary adopted. Further, the Secretary contends that small ponds were always subject to stability requirements in the

form of specific construction and design criteria.

> The standards outlined in [30 C.F.R. § 816.46 (1982)] with respect to quality control of materials, the relationship of height and width of embankments, and the specification of maximum side slopes were the equivalent of a static safety factor.... In the final rule the Secretary replaced the earlier design standards with the requirement for a 1.5 static safety factor and a 1.2 seismic safety factor. This rule was clearly within the scope of the two proposals.

Sec.Res. at 131. The Secretary also argues that the rules requiring foundation investigations and laboratory testing were properly noticed in that the proposed rule, 30 C.F.R. § 816.46(c), required that *all* sedimentation ponds be designed by, inspected during construction by or under the supervision of, and certified after construction by a registered professional engineer. The Secretary adds that "a professional engineer cannot certify a structure without adequate investigation and testing." Sec.Res. at 133. Industry vehemently disagrees, claiming that professional engineers do not reinvent the wheel every time a small sedimentation pond is built.

> [T]he professional engineer knows that certain designs have inherent stability and safety margins and does not conduct needless investigations, tests and calculations to tell him what he already knows. Thus, requiring small ponds to be certified is entirely different from requiring the expensive and elaborate tests dictated by § 816.49(a)(5).

Indus. Reply at 37.

Finally, the Secretary argues that proposed § 816.49(b)(2)(iv)(D) stated that impoundment foundations must be excavated and prepared to resist a failure, and required cutoff trenches if necessary for stability. This, he argues, was sufficient to

---

**17.** The court struck down this distinction for failure to be articulated based on a SMCRA rationale. *See, supra,* section II.D. The court's decision in regarding siltation structures is in no way inconsistent with the court's decision on the use of MSHA criteria in 30 C.F.R. § 816.-

49(a)(1). Instead, the court's ruling underlines the freedom the Secretary has to make policy determinations, provided he provides notice and comment and an adequate explanation for his actions.

inform interested persons that foundation investigation and testing was being proposed for all impoundments.

The court is persuaded that the rules objected to by Industry must be remanded because the proposed rule did not put interested parties on notice that the Secretary would abandon the distinction previously in the rules between small and large ponds, and did not provide notice of testing requirements with respect to small ponds. Obviously, a reviewing court, on an issue such as this, is at a disadvantage in understanding precisely which type of technical rule when proposed provides adequate notice of a particular variation when that rule is ultimately adopted. The parties' arguments on the notice issue tend themselves to be technical in nature. To defer, however, to the Secretary merely because the notice and comment issue involves a technical issue would be to abdicate the court's role under the APA.

Industry has argued that the former rules distinguished between the two types of sedimentation ponds, and that the proposed rule suggested that these smaller ponds would have to meet only an adequate safety factor. Although the court is not without some doubt as to the issue, it is persuaded by Industry's arguments that the change to a requirement of a specific safety factor was substantial enough a change to warrant a reason for departing from the old rules and, because the proposed rule did not require a specific static safety factor or testing, a new comment period. In supporting the rule, the Secretary relied, in part, on various design requirements imposed on small ponds under the old rule. Industry points out, however, that the old rules also had such requirements for large ponds, but, *in addition,* large ponds had to meet a 1.5 static safety factor. This tends to demonstrate that the design standards in the old rule were in no way sufficient to supply notice of the specific safety factor finally selected. Similarly, the court is persuaded that the requirement in § 816.49(a)(5)(i) of foundation and laboratory testing is not the equivalent of having the design certified by an engineer,

and therefore the Secretary was under an obligation to re-notice the rule. The court will remand 30 C.F.R. §§ 816.49(a)(3), 817.49(a)(3) and 816.49(a)(5)(i), 817.49(a)(5)(i), to the extent that they apply to small sedimentation ponds which previously were not required to meet the 1.5 static safety factor.

## VI. Impoundments

■ Citizen plaintiffs challenge 30 C.F.R. §§ 816.49(a)(9), 817.49(a)(9), 48 Fed. Reg. 44005–06 (1983), which permit the retention of highwalls in permanent impoundments. They claim that this is in violation of the statutory requirement at § 515(b)(3), 30 U.S.C. § 1265(b)(3), that "all highwalls [be] eliminated."

The Secretary's defense of the rule requires an explanation of various statutory provisions. The Secretary argues that § 515(b)(3) requires that postmining land be restored to its approximate original contour ("AOC"). The Secretary admits that in order to restore land to AOC, § 515(b)(3), as well as the definition of AOC embodied in § 701(2), 30 U.S.C. § 1291(2), requires the elimination of all highwalls. The definition of AOC, however, raises the possibility that highwall elimination is not required in impoundments because the AOC definition permits impoundments:

"approximate original contour" means that surface configuration achieved by backfilling and grading of the mined area so that the reclaimed area, including any terracing or access roads, closely resembles the general surface configuration of the land prior to mining and blends into and complements the drainage pattern of the surrounding terrain, with all highwalls and spoil piles eliminated; *water impoundments may be permitted where the regulatory authority determines that they are in compliance with section 515(b)(8) of this title.*

§ 701(2), 30 U.S.C. § 1291(2) (emphasis added). This language suggests that impoundments only have to meet the requirements of § 515(b)(8), 30 U.S.C. § 1265(b)(8), of the

Act which does not address the highwall issue with respect to impoundments. The Secretary argues, then, that the impoundment is, in effect, an exception to the AOC requirement, and because the specific provision relating to impoundments does not require highwall removal, such removal cannot be required under § 515(b)(3), 30 U.S.C. § 1265(b)(3).

The Secretary attempts to draw further support for his argument by noting that the provisions that permit express exceptions to the AOC requirement both expressly require the elimination of highwalls. Following this reasoning, he argues that since Congress placed no such express requirement within the provision covering impoundment "exceptions," it must have meant not to require the elimination of highwalls in impoundments.

This argument is not without its appeal, but the court finds that it suffers in several respects. First, the court notes that the performance standards embodied in § 515(b), 30 U.S.C. § 1265(b), expressly require the elimination of "all highwalls." The general standards of § 515(b)(3), 30 U.S.C. § 1265(b)(3), apply to "all surface coal mining operations," a term defined in § 701(28)(B), 30 U.S.C. § 1291(28)(B), to include impoundments. In addition, the Conference Report, in discussing the variance provisions for steep slopes, demonstrated Congress' concern that all highwalls be eliminated:

> The Senate amendment provided a variance to the approximate original contour and backfilling highwalls completely for a wide range of post mining land uses. In addition, if "sound engineering technology" indicated that the highwalls could not be completely backfilled, then the operator would have been required to reduce the highwall to the maximum extent consistent with "sound engineering technology" and develop a revegetation plan that is "reasonably calculated" to screen the remaining highwall within five years. H.R. 2 included no such provisions.

> Conferees agreed on a modified variance to the approximate original contour standard which requires that all highwalls are to be completely backfilled in every instance. This amounts to a variance from the "configuration" aspects of the regrading standard. [See the definition, Sec. 701(2)]. This gives an opportunity for a broad range of postmining land uses on those operations which would result in a very wide bench accommodating both the stable and complete backfilling of the highwall as well as additional areas for the planned land uses. Congress did not adopt the "sound engineering technology" provision of S. 7.

H.R.Rep. No. 493, 95th Cong., 1st Sess. 108–09 (1977), U.S.Code Cong. & Admin. News 1977, 740. Thus, where Congress expressly permitted exemptions from AOC it also required the elimination of highwalls. While the Secretary argues that this means highwalls did not have to be eliminated under § 515(b)(8), the court is wary of permitting highwalls to remain in impoundments under an "implied" exception to AOC, when Congress did not even permit the retention of highwalls when granting express exemptions from AOC. Further, the above language in the Conference Report supports a reading that the reference in § 701(2), 30 U.S.C. § 1291(2), to "impoundments" acts as an exception to the "configuration" aspects of the AOC rule, but not necessarily to the highwall elimination aspect. Seen this way, the "grading" reference in § 515(b)(8), 30 U.S.C. § 1265(b)(8), does not directly address the highwall issue. The court will remand §§ 816.49(a)(9) and 817.49(a)(9) to the Secretary as inconsistent with law.

### B. Combination Spillway Requirement

In its initial memorandum Industry challenged the combination spillway requirement of 30 C.F.R. §§ 816.49(a)(8) and 817.-49(a)(8). In his response memorandum the Secretary announced that he "intends to propose a rule specifying that one spillway that can safely pass the design precipitation event may serve as a combination principal and emergency spillway." Sec.

Res. at 136 n. 85. The issue has thus been conceded, and the Secretary, in accordance with the accompanying Order, shall proceed to propose such a rule.

## VII. Remining

### A. The Definition of "Previously Mined Area"

 Citizen and environmental groups next challenge the definition of "previously mined area" embodied in 30 C.F.R. § 701.5 (1984); 48 Fed.Reg. 41734 (1983). That definition reads:

> Previously mined area means land disturbed or affected by earlier coal mining operations that was not reclaimed in accordance with the requirements of this chapter.

This definition is important in determining the extent of highwall elimination called for under 30 C.F.R. §§ 816.106(a) and 817.106(a) (1984) which permits exceptions to the highwall elimination requirements when an operator is remining a previously mined area. The citizen plaintiffs complain that the above definition is so broad as to include all unreclaimed lands including those mined subsequent to the effective date of the Act. This they claim is in direct contravention of the Act's requirement, and Congress' intent to eliminate highwalls.

This court in its Round I opinion considered the issue whether "Congress intended the regrading requirements to apply to preexisting highwalls"—that is, those existing before the effective date of the Act. Round I Opinion, at 26. The court declined to apply the requirements of the Act retroactively in part because the Act's provision dealing with coal waste expressly calls for retroactive application whereas the highwall provision does not. Further, the Secretary had advanced sound reasoning for creating a "limited exception to elimination of highwalls where insufficient spoil exists in the immediate vicinity of the auger mining operation." *Id.* at 29.

Citizen plaintiffs claim that the Round I opinion addressed and resolved this issue in their favor where the court declared in dicta that "[i]t is clear that any highwalls in future auger mining regulations must be totally eliminated...." *Id.* at 28. This dicta does not resolve the present issue. Nevertheless, the logic of that opinion, and the fact that the court approved what it then called a limited exception to the highwall elimination requirement, suggests that the current rule in permitting exceptions to highwall elimination in situations where land is left unreclaimed after the Act's effective date goes beyond what is permitted by the Act.

The Secretary responds that the remining regulations

> require[ ] preexisting highwalls on previously mined areas to be eliminated to the maximum extent technically practical, using all reasonably available spoil. This regulation addresses the distinct situation where insufficient spoil exists to completely eliminate highwalls created and left by previous mining operations. The problem of generating sufficient spoil to completely eliminate an orphan highwall is equally acute for both pre-Act and post-Act abandoned mine sites.

Sec.Res. at 137.

The Secretary's reliance on this court's previous opinion is misplaced. In pointing to the requirement of 30 U.S.C. § 1265(b)(13) that both existing and new coal mine waste piles be eliminated, the court necessarily concluded that the word "existing" referred to those coal mine waste piles in existence prior to the Act's passage. Thus, the court permitted a narrow exception to highwall elimination for highwalls existing prior to the passage of the Act.

The Secretary then makes a practical argument that the rule will allow for substantial reclamation of areas not otherwise likely to be reclaimed. These regulations are more likely to induce remining, the logic runs, and therefore more reclamation will occur than otherwise might have. At oral argument, however, counsel for the government indicated that he was not aware of any support in the record for this

rationale. Oral Arg.Tr. at 69. Further, the Secretary argues that contrary to the views of citizen plaintiffs, the Secretary will still actively pursue those who illegally failed to reclaim the land. The Secretary, in effect, has decided that reclamation can be achieved more efficiently if he creates a variance from the Act's requirement that all highwalls be eliminated. The Secretary argues that this is permissible because the regulations address a unique situation not considered by Congress. "Insufficient spoil for complete highwall elimination may exist regardless of when an abandoned site was mined." Sec.Res. at 140.

In their reply, the environmentalists counter that Congress intended that *all* highwalls created after the Act was passed be eliminated. As evidence they point to the Abandoned Mine Land Reclamation program of Title IV which is expressly limited to pre-Act mining. They further argue that the rule will interfere with the bonding system, and enforcement against the previous owner will be impractical because two operators would be present at once.

The court will remand the Secretary's regulation as inconsistent with law. The court begins by noting that in its Round I opinion, the court pointed to the "sweeping" language of § 515(b) which provides:

> General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as a minimum to—
>
> . . . .
>
> (3) except as provided in subsection (c) of this section with respect to all surface coal mining operations backfill, compact (where advisable to insure stability or to prevent leaching of toxic materials), and grade in order to restore the approximate original contour of the land with *all* highwalls, spoil piles, and depressions eliminated
>
> . . . .

30 U.S.C. § 1265(b) (emphasis added).

Three points are noteworthy about the provision. First, the statute sets forth what it describes as the *minimum* requirements. This, of course, suggests a floor below which the Secretary is not empowered to go in setting less demanding standards. Second, the provision plainly calls for the elimination of *all* highwalls. Third, the very subsection which calls for the elimination of all highwalls makes explicit references to possible exceptions to the provisions. This, of course, suggests that Congress considered when exceptions to this minimum requirement might be permitted, and thus the Secretary has no authority to create further exceptions.

The court in its Round I opinion also noted that "[t]he Act and its legislative history reflects Congress' deep concern that all surface mining and reclamation operations be returned to approximate original contour." Round I Opinion, at 28. That statement relied on the following statement in the House Report:

> [T]he elimination of highwalls, return of the land to approximate original contour, and establishment of viable vegetative cover are among the standards critical to the elimination of the worst effects of coal surface mining. . . .

H.R.Rep. No. 218, 95th Cong., 1st Sess. 85 (1977), U.S.Code Cong. & Admin.News 1977, 621. Thus Congress saw the elimination of highwalls as critical.

What is perhaps more noteworthy about the passage from which the above statement comes, however, is that the statement was made in a context of demonstrating that "the committee has approved exceptions to these [reclamation] requirements to achieve flexibility and avoid arbitrary constraints." *Id.* This suggests that Congress expressly considered what exceptions might be necessary. In the face of the plain language requiring the elimination of all highwalls in a subsection that already notes possible exceptions, Congress' deep concern with reclamation, and the legislative history, the court concludes that the Secretary's definition of previously mined

area in 30 C.F.R. § 701.5 must be remanded.[18]

VIII. Variances

A. General Variance from AOC

■■■ Citizen plaintiffs and environmental groups next complain that the final rules promulgated at 30 C.F.R. §§ 785.16 (1984), 48 Fed.Reg. 39904, 44780 (1983), 816.133(d) and 817.133(d) (1984), 48 Fed. Reg. 39904–05 (1983), establish a general variance from the approximate original contour ("AOC") restoration requirement in direct contravention of the previous judgment of this court in its February 1980 opinion.

The problem before the court is to decide whether the variance provisions in section 515(e) relate solely to the steep slope requirements set out in § 515(d)(2) or can also be read to permit a general variance to the requirements of § 515(b)(3) that operators restore the original contour of the land. The Secretary asks the court to reconsider its previous holding on this issue.

Before proceeding to a discussion of the arguments, it is necessary to outline the statutory framework involved in this issue. Section 515, 30 U.S.C. § 1265, of the Act is the section that sets forth the environmental protection performance standards. Among those standards are those set forth at § 515(b)(3) which require, *inter alia*, the mining operation at a minimum to:

except as provided in subsection (c) of this section with respect to all surface coal mining operations backfill, compact ... and grade in order to restore the approximate original contour of the land with all highwalls, spoil piles, and depressions eliminated (unless small depressions are needed in order to retain moisture to assist revegetation or as otherwise authorized pursuant to this chapter)....

The Secretary points out in his memorandum that because "these are general performance standards, the AOC restoration requirements are applicable to mountaintop removal operations, operations on steep and non-steep slopes, as well as to operations on any other type of terrain that is mined." Sec.Res. at 142 n. 91.

Subsection (d) of § 515 *adds* certain performance standards to be "applicable to steep-slope surface coal mining and shall be in addition to those general performance standards required by this section." Subsection (e), the source of the current dispute, then contains the following language with regard to variances:

(e)(1) Each State program may and each Federal program shall include procedures pursuant to which the regulatory authority may permit variances for the purposes set forth in paragraph (3) of this subsection, provided that the watershed control of the area is improved; and further provided complete backfilling with spoil material shall be required to cover completely the highwall which material will maintain stability following mining and reclamation.

(e)(2) Where an applicant meets the requirements of paragraphs (3) and (4) of this subsection a variance from the requirement to restore to approximate original contour set forth in subsection (d)(2) of this section may be granted for the surface mining of coal where the owner of the surface knowingly requests in writing, as a part of the permit application that such a variance be granted so as to render the land, after reclamation, suitable for an industrial, commercial, residential, or public use (including recreational facilities) in accord with the further provisions of (3) and (4) of this subsection.

§ 515(e), 30 U.S.C. § 1265(e).

As the Secretary explains in his memorandum:

Section 515(e) is subject to the following three interpretations: (1) section 515(e) establishes one variance which applies only to mining on steep slopes; (2) sec-

---

**18.** Even if the court were not to remand the regulation as inconsistent with law, it would have to remand the regulation because the ma-

jor rationale advanced in this litigation for its existence is not set out in the preamble to the final rule.

tion 515(e) establishes one variance which applies to mining on both steep and non-steep slopes; or (3) section 515(e) establishes two variances, one general and one applicable to steep slopes.

Sec.Res. at 144. The Secretary explained that he adopts the second theory, and Industry the third. The plain language of the statute is not as clear as citizen plaintiffs would have the court find. The citizen plaintiffs' best arguments are based on the fact that when Senator Ford introduced the variance provision in the Senate, he declared, as pointed out in this court's February 1980 opinion, that "S.7 as written and reported, requires return to approximate original contour in every instance where mining is undertaken on slopes in excess of 20 degrees.... My amendment proposes a variance procedure from this absolute requirement. 123 Cong.Rec. 15233–34 (1977). Further, they point to the fact that although at one time in the legislative process there was a variance amendment that included a direct reference to the § 515(b)(3), non-steep slope, AOC requirement, that reference was *deleted* in the conference committee and never made its way into the bill. In addition, they believe that the Conference Report which divided discussion on the bill into three sections, and discussed the variance provision under the section dealing with steep slope mining is further evidence of the fact that the Congress intended the variance to apply only to steep slope mining. Citizen Plaintiffs' Mem. at 125 (citing H.R.Rep. No. 493, 95th Cong., 1st Sess. 107–09). Finally, the citizen plaintiffs point to Senator Metcalf's explanation delivered on the floor of the Senate on July 18, 1977, when reporting the text of the final bill and the Conference Report to the Senate:

> (d) Landowners in mountainous areas have been concerned that where strip-mining produces flat land which is useful for residential, industrial or other types of development, the steep slope performance standards of the bill would preclude such valuable uses. In recognition of this need the conference report modifies the standards so as to allow retention of strip mine benches.

123 Cong.Rec. 23609–10 (1977).

The Secretary and Industry attempt to construct an argument based largely on what was *not* said in the legislative history. Because each take a slightly different approach they will be summarized separately. The Secretary begins his analysis by agreeing with the citizen plaintiffs that Senator Ford was the sponsor of the amendment designed to permit variances. As written, it applied not only to the provisions of 515(d)(2) but also to the provisions of 515(b)(3). *See* 123 Cong.Rec. 15705 (1977). During this same period that Senator Ford was proposing an amendment, Senator Jennings Randolph was also proposing an amendment. He never offered his amendment for consideration, however, because of the similarity between his amendment and that of Senator Ford. Rather, Senator Randolph contented himself with being a co-sponsor of the Ford amendment and took the opportunity to read what was to have been his amendment into the record and to make remarks. In making those remarks, Senator Randolph stated that his amendment "is generally designed for use in *non*-steep slope regions." 123 Cong. Rec. 15710 (1977) (emphasis added). His amendment in the equivalent section to now (e)(2) also referenced both 515(b)(3) and (c)(2), the *two* AOC restoration requirements. 123 Cong.Rec. 15711 (1977).

The Ford amendment would have permitted the retention of highwalls when variances were granted, and the Randolph amendment would not have. When the Ford amendment was offered, however, it was this highwall aspect that generated the most controversy and debate on the provision. This controversy was ultimately quieted with the substitution of the Randolph amendment for the Ford amendment. "With the unexplained deletion of the reference to section 515(b)(3) in section 515(e)(2) and one other unrelated change, the Randolph amendment was enacted as section 515(e)." Sec.Res. at 149. The Secretary argues that the *unexplained* dele-

tion of the reference to what is now section 515(b)(3) does not lead inexorably to the conclusion that § 515(e) was meant to provide a variance only for § 515(d)(2) requirements—steep slope mining. *Id.* (citing *Trailmobile Co. v. Whirls,* 331 U.S. 40, 60, 67 S.Ct. 982, 992, 91 L.Ed. 1328 (1947)).

The Secretary's argument then continues that the court can discern the legislative intent by looking to the amendment as approved on the floor of the Senate and comments by participants of the conference. Thus, he points to the remarks of Congressman Udall on the floor of the House explaining the conference committee changes, in which he did *not* mention that the variance applies only to steep slope mining. But the court notes that Congressman Udall did not mention that it was broader than steep slope mining either. Congressman Udall merely declared that:

> The conference report includes a modified variance to the approximate original contour standard which requires however that in every instance all highwalls are to be completely backfilled. This amounts to a variance from the "configuration" aspects of the approximate original contour regrading standard. This gives an opportunity for a potential range of post-mining land uses from those operations which would result in a very wide bench accommodating both the stable and complete backfilling of the highwall as well as additional areas for the planned land uses.... This variance procedure in section 515(e) contemplates only one variance procedure for the entire subsection which is conditioned by the constraints discussed above including the complete backfilling of all highwalls.

123 Cong.Rec. 24421 (1977). In addition, the Secretary points to the remarks of Representative Seiberling, made in 1979 oversight hearings in which he declared it his "personal view ... that [522(e)] does not just apply to steep slopes...." *Implementation of the Surface Mining Control and Reclamation Act of 1977, Oversight Hearings before the Subcomm. on Energy and the Environment of the House Comm. on Interior and Insular Affairs,* 96th Cong., 1st Sess. 47 (1979).

Industry admits that section 522(e) is "wretchedly drafted and admits of no clear interpretation," Indus. Intervenors' Mem. at 88. It does not consider it possible to extract a dispositive reading from the words, and attempts merely to make its analysis more persuasive than the citizen plaintiffs'. The thrust of its argument is that the deletion of the general AOC requirements found in 515(b)(3) was not an effort to delete a variance for this section because it was logical to conclude that (e)(1) allowed a general variance, whereas (e)(2) allowed a variance only for the 515(d)(2) requirements relative to steep slopes. It supports this construction by arguing that it would make no sense to have a reference to subparagraph (3) in (e)(1) and then again in (e)(2) unless the provisions were meant to accomplish different goals.

Industry finds support in the legislative history that when Senator Ford first offered the variance provision, that provision explicitly referred to both the steep slope, (d)(2), and the general AOC, (b)(3), provision. It contends that although there can be no doubt that the provision was offered and supported to afford a variance with respect to the steep slopes of Appalachia, the language of the bill extended the variance to the general AOC requirement. This it concludes because the amendment was often discussed in terms of trying to avoid "unyielding and inflexible adherence to the concept of 'return to approximate original contour'" 123 Cong.Rec. 15705 (1977) (remarks of Sen. Ford). Further, the West Virginia law, which allowed a general variance, was mentioned, and Senator Huddleston, in addition to discussing Appalachia, added:

> Each State has its own geographical characteristics. No doubt it is safe to say that surface mining conditions vary from State to State, especially in regard to the steepness of slope and soil conditions prevailing where contour surface mining methods are employed.

. . . .

I feel that Senator Ford's amendment recognizes the individual needs of the States that make up our great Nation and the need for control mechanisms that would allow post mining land use in the public interest.

*Id.* at 15706–07.

Industry also argues that nowhere in the conference committee was there ever any discussion of eliminating the general variance reference to 515(b)(3), and that it must have been done either because staff thought that (e)(1) covered it, or simply as an oversight. In any event, it argues that the court should not give much weight to the deletion of the 515(b)(3) reference done without any supporting explanation.

Finally, it argues that the policy of the Act supports the Secretary's interpretation in that the variance is permitted only if the application can demonstrate compliance with a dozen safeguards in the Act. Thus, there is little chance of harm, and the court should defer to the Secretary on the determination of how much harm might result from the Secretary's reading of the variance.

The Secretary is asking the court to put back into the statute the reference to 515(b)(3) deleted in the conference committee. The request is made without taking into account the fact that the Supreme Court has stated that "[w]hen the terms of a statute are unambiguous, our inquiry comes to an end, except in 'rare and exceptional circumstances.'" *Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171 (1981) (quoting *TVA v. Hill,* 437 U.S. 152, 187 n. 33, 98 S.Ct. 2279, 2298 n. 3, 57 L.Ed.2d 117 (1978)). Further, before a court is to stray from the literal words of a statute, "there must be something to make plain the intent of Congress that the letter of the statute is not to prevail." *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930). When viewed against this standard, the muddled legislative history does not pro-

vide sufficient clarity to permit the court to re-insert the provision deleted in conference. This is not to say that the Secretary's version of events is inaccurate, but the court is not convinced that the conclusion that (e)(2) was meant to apply to non-steep slopes is so clear that the court can declare it so.

First, the court notes the remarks of Senators Ford and Metcalf relating specifically to a needed variance from the steep slope requirements. Second, as citizen plaintiffs point out, the discussion of the variance in the Conference Report is embodied in the section dealing with steep slopes. Finally, all parties concede that the debate surrounding the amendment centered largely around the need for a variance from the steep slope requirement. Weighed against this are the remarks of Senator Randolph that his amendment, the one ultimately adopted, was intended to apply to non-steep slopes, the fact conceded by the environmentalists that the amendment as written would have applied to non-steep slopes, and the lack of explanation for the deletion in conference.[19] As to this last point, however, it is not clear that the drafters did not delete the reference to (b)(3) because they belatedly realized that it would provide a broader variance than anyone was proposing.

As to Industry's argument with respect to 515(e)(1), it has really not added anything new to arguments advanced when the court decided in 1980 that (e)(1) merely requires the state and federal programs to set up a variance procedure. If it was intended to grant a variance itself, it is difficult to understand why its wording would have been so different from (e)(2) which everyone agrees grants a variance. The court concludes that Congress and not this court is the proper forum in which to seek a general variance from the AOC requirement. The rules at 30 C.F.R. §§ 785.-16, 816.133(d), and 817.133(d) are remanded as inconsistent with law to the extent they

---

**19.** This list is merely a summary of the major factors; the court has considered all of the

arguments on the provisions raised by the parties.

permit a variance beyond the variance for steep slopes embodied in 515(e)(2).[20]

### B. Mountain Top Removal

Citizen and environmental groups also challenged in their initial motion the Secretary's final rule regarding the mountain top removal mining operations. This rule appears at 30 C.F.R. § 785.14. They claimed that the regulation omitted certain of the statutorily mandated criteria embodied in § 515(c) of the Act. In its opposition, the Secretary stated that it did not oppose the challenge and declared that "The deletions of references to the statutory criteria of sections 515(c)(3)(A) and (B) were inadvertent. Such references will be reinstated in a new rulemaking." Sec.Res. at 142 n. 90. The challenge is thus rendered moot.

### IX. Permitting

■ Section 506(a), 30 U.S.C. § 1256(a), reads in pertinent part:

No later than eight months from the date on which a State program is approved by the Secretary ... or no later than eight months from the date on which the Secretary has promulgated a Federal program for a State not having a State program ... no person shall engage in or carry out on lands within a State any surface coal mining operations unless such person has first obtained a permit issued by such State pursuant to an approved State program or by the Secretary pursuant to a Federal program; except a person conducting surface coal mining operations *under a permit from the State regulatory authority, issued in accordance with the provisions of section 1252* [§ 502—on interim programs] of this title, may conduct such

operations beyond such period if an application for a permit has been filed in accordance with the provisions of this chapter, but the initial administrative decision has not been rendered. (emphasis added).

The provision proscribes mining without a permit eight months after the state or federal regulatory program has been approved, but permits a grace period for holders of a permit under the interim regulations if a final decision on their final permit has not been made within the eight-month window.

Citizen and environmental groups challenge 30 C.F.R. § 773.11(b)(2) (1984), 48 Fed.Reg. 44392 (1983), which permits "[a] person *authorized to conduct surface coal mining* and reclamation operations under the initial regulatory program, *or under a permit* issued or amended by the regulatory authority in accordance with section 502 of the Act," (emphasis added), to conduct such operations beyond the eight-month period described in § 773.11(a) under certain conditions. Citizen plaintiffs contend that this grace period provision extends unlawfully to those who did not obtain a permit under the interim regulations.

The Secretary in support of the rule cites legislative history to the effect that the purpose of the exception was to avoid having to shut down ongoing operations due to administrative delay. S.Rep. No. 128, 95th Cong., 1st Sess. 74 (1977). Further, the Secretary argues that because § 773.-11(b)(2)(iii) will extend the rule only to those operations conducted in compliance with the requirements of the Act, there is no environmental danger from bringing within the grace period those operations

---

**20.** The Secretary argues that because the requirements of § 515(d) are in addition to those embodied in § 515(b), a variance for steep slopes must necessarily include a reference to § 515(b) to have any meaning at all. This argument is not persuasive. With respect to return to AOC, the § 515(d)(2) requirement effectively repeats the AOC requirement in § 515(b)(3). Section 515(e)(2) then expressly grants a variance to the § 515(d)(2) AOC requirement. The court has no trouble reading the 515(e)(2) re-

quirement as having meaning with respect to steep slopes without reading back into it the reference to § 515(b)(3). The court notes, in addition, however, that the Secretary's reasoning actually works against him. If the inclusion of a reference to (b)(3) is necessary to give meaning to (e)(2) with respect to steep slopes, then the picture is even more clouded with respect to whether the proposed amendments that included a reference to (b)(3) ever were meant to grant variances for non-steep slopes.

merely authorized during the permit period. In addition, the Secretary relies on his broad rulemaking power recognized in *In Re: Permanent Surface Mining Regulation Litigation*, 653 F.2d 514 (D.C.Cir.), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981).

Finally, the Secretary in the preamble to the final rule explained the rationale that "[i]t would be inequitable ... to deny some operators the privilege of continuing operations solely because they were not required to have a permit during the initial program." 48 Fed.Reg. 44354 (1983).

The Secretary's argument—however persuasive as a matter of policy—does not address the plain language of section 506(a), and Congress' express requirement that only permit holders be extended the grace period. Despite the Secretary's broad rulemaking power, such power cannot be permitted to be exercised in direct contravention of the express language of the Act. 30 C.F.R. § 773.11(b)(2) is remanded to the Secretary.

## X. Coal Exploration

### A. Notice Provisions

 Section 512(a), 30 U.S.C. § 1262(a), is at the center of this next challenge which involves the question of whether *anyone* conducting coal exploration must notify the regulatory authority, or whether it is permissible for the Secretary to promulgate a rule requiring that only those whose exploration operations *"may substantially disturb the natural land surface,"* 30 C.F.R. § 772.11(a) (1984), 48 Fed.Reg. 40634 (1983), notify the regulatory authority. Section 512(a) of SMCRA provides:

> Each State or Federal program shall include a requirement that coal exploration operations which substantially disturb the natural land surface be conducted in accordance with exploration regulations issued by the regulatory authority. Such regulations shall include, at a minimum (1) the requirement that prior to conducting any exploration under this section, any person must file with the regulatory authority notice of intention to explore and such notice shall include a description of the exploration area and the period of supposed exploration and (2) provisions for reclamation in accordance with the performance standards in section 1265 of this title of all lands disturbed in exploration, including excavations, roads, drill holes, and removal of necessary facilities and equipment.

The thrust of the citizen plaintiffs' claim is that by writing a rule in such a way that the operator gets to make a pre-notice determination of whether the contemplated exploration may substantially disturb the natural land surface, the Secretary is, in effect, inviting operators who plan to explore to err on the side of not filing an intent to explore notice with the regulatory authority.[21]

The citizen plaintiffs point to the comments of three states that urged the Secretary to retain the mandatory notice requirement. The thrust of the arguments by the states was that if the regulatory authority does not have notice of a proposed exploration, it cannot enforce the provisions of the Act. Plaintiffs argue that the Secretary's response to these comments, that the problems of failing to file notices was an enforcement problem, was an inadequate response thus rendering the final rule irrational because of its failure to explain the departure from the old requirement, or justify the new requirement.

The Secretary first relies on the literal language of the Act which arguably can be read to require filing of notice only by those whose mining may disturb the land surface. Second, the Secretary argues that the regulatory authority must still determine those operations which will substan-

---

**21.** In this court's February 1980 opinion, the court upheld the previous regulation that required any person planning to explore to file a notice with the regulatory authority. The issue there, of course, was whether it is permissible under the statute to *require* such notice. Because the provision was being challenged, the court did not have occasion to consider whether such mandatory notice was *required* by the Act.

tially disturb the surface; this is so, he argues, because under the current rule the regulatory authority must promulgate a definition for the term "substantially disturb" that is no less effective than the Secretary's definition. Further, the regulatory authority *may* require notice from all exploration operations if it so chooses. The Secretary emphasizes that the rule sets only a minimum standard that the states may exceed.

The court begins its discussion of this rule by noting that even if the Secretary's rule establishes a minimum standard, that standard must still comport with the Act's requirements and must be reasonable. It does not take a great deal of technical competence to understand the problems addressed by the states who wanted to keep the old rule: how does a state know about exploration operations it is not told about? Further, although the court need not decide that the old rule was the only method of carrying out the requirements of the Act, there must be something in the record to show that the Secretary considered the practical problems raised by the states and addressed them in a reasonable way. There is no such showing in the record. For example, merely labeling the problem raised by the states as an enforcement problem does not address the underlying concern that coal operators given a *gray area* in which to operate may manage to explore in violation of the Act more easily than if they are required to go on record as proposing exploration. It is not enough to say that some may have chosen not to file under the old rule. This is true enough, but failing to file a notice was a clear cut violation, whereas under the rule as promulgated the question of whether it is a violation not to file may be a judgment call never clearly in violation of the Act. In addition, there is no attempt to show that the burdens on enforcement imposed by the new rule are outweighed by some benefit. The Secretary pointed to the only benefit of the new rule as "eas[ing] the paperwork burden associated with the previous filing requirement." 48 Fed.Reg. 40625 (1983). This is a commendable goal, but it,

standing alone, does not support a view that the rule as promulgated is a rational way to carry out the provision's purpose of regulating certain coal exploration operations. On the current state of the record, the court must conclude that the failure to deal rationally with the concerns raised by commenters, or to adequately explain departure from the old rule, renders the rule arbitrary and capricious. 30 C.F.R. § 772.11(a) must be remanded to the Secretary for proceedings not inconsistent with this opinion.

B. Narrative Description as Opposed to a Map

██ Final rules 30 C.F.R. §§ 772.11(b)(3) and 772.12(b)(3) (1984), 48 Fed.Reg. 40634 (1983), require a notice of intent, when filed, to contain a description of the proposed area and allows the operator to decide whether to submit a narrative description or simply a map of the proposed area. The regulation in § 772.11(b)(3) applies to those notices filed when exploration activities are to remove 250 tons of coal or *less;* § 772.12(b)(3) applies when attempting to obtain a permit to remove *more* than 250 tons of coal. Citizen plaintiffs argue that allowing the filing of a map alone is insufficient to meet the requirements of the Act that a notice of intention to explore "include a description of the exploration area." § 512(a), 30 U.S.C. § 1262(a). They argue further that allowing a map alone is inconsistent with the express purposes of this section.

Citizen plaintiffs complain that a narrative description is necessary "in order that the public can locate and readily identify the proposed exploration area." Citizen Plaintiffs' Mem. at 182. They rely in part on this court's May 1980 opinion in which the court struck down Secretary Andrus' regulation under this section of the statute that required both a narrative description *and* a map. The court struck down that provision declaring that it would not "convert a description into a map." In addition, however, the court declared that *"[m]ore importantly,* the legislative deletions of

the map ... [requirement] indicate Congressional concern to streamline the exploration notice requirements." May 1980 Opinion at 54 (emphasis added).

Because the stricken requirement called for operators to submit both a narrative description *and* a map, the court will not read that ruling to proscribe the possibility that a map could meet the statutory requirement of a "description." If the language in the May 1980 opinion suggests otherwise, the court expressly now rejects such a suggestion.

The court is more concerned, however, that one of the regulations in question, § 772.11(b)(3), concerning removal of 250 tons or less, contains no standards explaining what level of detail in the map will suffice to meet the Act's requirements. The court rejects the Secretary's suggestion that § 772.11(b)(5) somehow supplies that detail. Further, the court is persuaded that the details of what a "map" must describe contained in § 772.12(b)(12) do not clearly apply to the requirement embodied in § 772.12(b)(3) that permits either a map *or* a narrative description, "describing the proposed exploration area," and certainly § 772.12(b)(12) does not apply to § 772.11(b)(3). The map required by § 772.12(b)(12) is a map "showing the areas of land *to be disturbed* by the proposed exploration...." (Emphasis added). Thus the areas under section (b)(3) and under (b)(12) may be different, which suggests that the map specificity in (b)(12) does not necessarily apply to (b)(3). In any event, even if the Secretary intends the map requirements in (b)(12) to apply to (b)(3), it is not clear enough that they do so, and for that reason the rule must be remanded. The court remands these rules noting that by arguing that (b)(12) applies to the map requirement of (b)(3), the Secretary apparently concedes that the regulation must do more than simply call vaguely for "a narrative or map describing the exploration area" as called for by §§ 772.11(b)(3) and § 772.12(b)(3). As is stated in the Secretary's memorandum, "The purpose of the provision [§ 512(a)(1) ] is to provide the regulatory authority and any interested person

with an *accurate description* and the *precise* location of the proposed exploration area." Sec.Res. at 163 (emphasis added).

## XI. Definitions

 Citizen plaintiffs and environmental groups next claim that the Secretary has unlawfully defined the term "affected areas" at 30 C.F.R. § 701.5 (1984) to exclude certain roads that they contend Congress intended to be covered by the Act. The definition reads, in pertinent part:

> The affected area shall include every road used for purposes of access to, or for hauling coal to or from, surface coal mining and reclamation operations, unless the road (a) was designated as a public road pursuant to the laws of the jurisdiction in which it is located; (b) is maintained with public funds, and constructed, in a manner similar to other public roads of the same classification within the jurisdiction; and (c) there is substantial (more than incidental) public use.

The citizen plaintiffs complain that this definition is flatly inconsistent with the broad definition of surface coal mining operations in § 701(28), 30 U.S.C. § 1291(28), of the Act, which includes "all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities, and for haulage." They further argue that the definition fails to implement properly the requirement of § 528(2), 30 U.S.C. § 1278(2), of the Act that only commercial "operations that affect two acres or less" be exempted from the provisions of the Act because a broad roads exemption will necessarily increase the number of operations that can take advantage of the two-acre exception.

The gist of the citizen plaintiffs' complaint is that although it is clear that not every road used for access or haulage must be included as an affected area, the Secretary has drawn the line too far in favor of exempting certain roads. They believe that Congress intended the Act to cover

those roads whose primary function or use was for coal haulage or access and did not mean to exempt those public roads merely because public use is more than incidental. In order to support this "primary function" approach the citizen plaintiffs rely on a colloquy between Senators McClure and Baker that the court finds unpersuasive on the issue of whether Congress intended a primary function approach.

On the other hand, the court is troubled by the rule insofar as its statutory basis is § 701(28), which includes in the definition of surface coal mining operations lands affected by the use of existing roads to gain access to the site of surface mining activities and for haulage. The Secretary acknowledges that "a road is part of a surface coal mining operation if it is built, used, or upgraded for access to the site of the mining operation or for haulage of coal." Sec.Res. at 169. Nevertheless, he contends that not every road when used to some degree for coal haulage or mine access falls within the definition of surface coal mining operation. The court accepts this premise because section 701(28) by its own terms includes only lands *affected by*, among other things, the use of existing roads. Presumably then, when hauling or access are among many uses made of a road, such as an interstate highway, the effect from the mining use is *de minimis*, or relatively minor, and thus the road need not be included as part of the surface coal mining operation. But the Secretary's rule goes far beyond what is called for by § 701(28) in exempting essentially all public roads where public use is more than incidental. This definition does not square with the statutory language and thus this aspect of the definition must be remanded as inconsistent with law.

Further, the court finds that the rule is irrational in that it does not appear rationally related to the Secretary's concern that interstate highways not be required to be permitted and reclaimed under the Act or the Secretary's conclusion that Congress "intended the Surface Mining Act to cover public roads used for coal haulage and access only when they are directly, rather

than incidentally, part of the mining operation." Sec.Res. at 171. The rule the Secretary created, however, excludes far more than interstate highways where the proportion of hauling and access can be expected to be relatively small. Nor does the rule concern itself with whether the road is in some way directly, rather than incidentally, part of the mining operation. Instead, the rule focuses curiously on whether the *public use* is more than incidental, in which case the road is exempt. The rule does not bear a logical nexus to the Secretary's goal in promulgating it, or to the Secretary's own stated understanding of what the law requires. It must be remanded.

## XII. Design Criteria

Industry challenged under the interim program and under the 1979 regulations the Secretary's authority to establish nationwide design criteria rather than more flexible performance goals or design guidelines. This court twice upheld the Secretary in this regard, both in its opinion on the interim regulations, *In Re: Surface Mining Regulation Litigation*, 456 F.Supp. 1301, 1308 (D.D.C.1978), *aff'd in part, rev'd in part*, 627 F.2d 1346 (D.C. Cir.), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981), and in its May 1980 opinion at 39–40. "The court declines to reverse its previous ruling on this issue. [citing 456 F.Supp. at 1308]. We reaffirm that Section 201(c)(2) provides the Secretary with discretion to impose both performance standards and design criteria." May 1980 Opinion at 40.

Industry now argues that since the Secretary has rescinded the vast majority of design criteria-based regulations, the issue is no longer before the court. They claim that

The elimination of specific, detailed design criteria from the regulations, or at the very least the uncertainty whether any true "design criteria" continue to exist in the present regulations, means that the Secretary's authority to estab-

lish uniform design criteria is no longer a viable issue and may never become one. Indus.Mem. at 109. Thus, it suggests that the issue of whether the Secretary possesses this broad authority is not ripe, and therefore the court is without jurisdiction to decide the issue in the absence of any specific challenge. The Secretary asks the court to reaffirm its prior ruling because the surface miners will presumably want the court to vacate the earlier opinions which are here on remand, and because in the Secretary's opinion, the current rules do reflect design criteria; thus, the Secretary believes the current issue is ripe for determination.

The court cannot now decide an issue that is not now before it on a challenge. However, the court will give the parties seven days in which to amend the Judgment and Order that accompanies this Memorandum Opinion with respect to which of the issues raised and decided in the 1980 litigation should now be considered final judgments for purposes of appeal, if indeed any should be so considered.

In its Order dated February 1, 1983 remanding this action to this court, the Court of Appeals noted that the parties to the appeal then pending had stipulated that the case

be remanded to the District Court with instructions to retain jurisdiction pending promulgation of the revised regulations, and providing that the judgment of the District Court shall not be considered final for purposes of appeal with respect to any regulation which is now on appeal, until such time as (1) the District Court determines that it should be made final as to a particular regulation because the regulation is unaffected by the Secretary's current program of regulatory revisions, or (2) the District Court's review pursuant to 30 U.S.C. § 1276(a)(1), of any new regulation raising the same or similar issues has been completed.

The court will order that the parties, by joint stipulation if possible, within seven days of the date of the accompanying Judgment and Order, move to add whichever issues, if any, they now believe should be incorporated in an amended final Judgment and Order for purposes of appeal. Given the unique nature of the remand in this case, the court is inclined to be careful not to cut-off appeal rights in this case.